# CAPITAL CASE No. _____

## **Execution date set for August 15, 2019**

## IN THE
## UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

IN RE DEXTER JOHNSON,

MOVANT.

## PROPOSED SECOND OR SUCCESSIVE PETITION FOR WRIT OF HABEAS CORPUS PURSUANT TO 28 U.S.C. § 2244

JASON D. HAWKINS
Federal Public Defender
Northern District of Texas

Jeremy Schepers (24084578)
Supervisor, Capital Habeas Unit

Jessica Graf (TX 24080615)
Assistant Federal Defender

Office of Federal Public Defender
Northern District of Texas
525 S. Griffin St., Ste. 629
Dallas, TX 75202
214-767-2746
214-767-2886 (fax)
Jeremy_Schepers@fd.org
Jessica_Graf@fd.org

# TABLE OF CONTENTS

TABLE OF CONTENTS ...........................................................1

I.    Introduction. ...........................................................3

II.   Procedural history. ...................................................5

III.  Mr. Johnson meets the requirements of 28 U.S.C. § 2244. .............8

      A.    Mr. Johnson has not previously presented an *Atkins* claim in federal court. ..........................................9

      B.    Mr. Johnson is intellectually disabled. .................................11

            1.    Mr. Johnson has limitations in intellectual functioning. ..................................................12

            2.    Mr. Johnson has deficits in adaptive functioning. .......18

            3.    The onset of the disorder was during the developmental period. .................................29

            4.    Mr. Johnson application is timely or he can establish equitable tolling. ...........................................30

      C.    Mr. Johnson's *Atkins* claim was previously unavailable under 28 U.S.C. 2244(b)(2)(A), because his *Atkins* claim required the publication of the DSM-5. ...............................34

            1.    Under the controlling precedent of *In re Cathey*, Mr. Johnson's *Atkins* claim was previously unavailable. ................................................35

            2.    It was not feasible for Mr. Johnson to amend his *Atkins* claim into the initial petition. ..........................42

      D.    Mr. Johnson can make a showing of diligence and innocence under 28 U.S.C. § 2244(b)(2)(B). ..........................45

IV.    Conclusion and prayer for relief. ...................................................47

## I.    Introduction.[1]

Texas stands on the precipice of executing an intellectually disabled man. Two recent, independently conducted expert evaluations reach the same conclusion: Dexter Johnson is intellectually disabled, placing him in a class of individuals categorically excluded from the death penalty. *See Atkins v. Virginia*, 536 U.S. 304 (2002); Ex. 1; Ex. 2. This claim comes to this Court at this late hour because Mr. Johnson's *Atkins* claim was previously unavailable to him at the time of his initial federal habeas proceedings. At the time of his 2007 trial and the filing of his initial federal habeas petition in 2011, the DSM-IV-TR was the most recent edition of that manual published by the American Psychiatric Association for the diagnosis of the disorder. That version of the manual heavily relied upon IQ test scores as the barometer for whether or not an individual was intellectually disabled. However, the newer version of that manual, the DSM−5, significantly alters the diagnostic criteria for the disorder and makes an *Atkins* claim available to Mr. Johnson.

---

[1] This document contains Mr. Johnson's proposed second or successive habeas petition that he seeks authorization to file in the district court. If authorized to proceed below, he will update the cover page, caption, and include the signatures, compliance statements, and verification as may be necessary in the district court before filing.

Dr. Dale Watson testified at Mr. Johnson's 2007 trial that it was unnecessary to inquire into Mr. Johnson's adaptive functioning due to his borderline IQ scores. Ex. 3 at ¶5. However, the publication of the DSM−5 in 2013—after the filing of Mr. Johnson's initial federal petition—brought about significant changes in the diagnosis of intellectual disability. Based upon these changes, Dr. Watson recognizes that Mr. Johnson's IQ scores do not preclude a diagnosis of intellectual disability, and as a result, no longer stands by his statement that an inquiry into Mr. Johnson's adaptive functioning is unnecessary. Ex. 3 at ¶8.

Under the current medical diagnostic framework as described in the DSM−5, Mr. Johnson is intellectually disabled. *See* Ex. 1; Ex. 2. He has deficits in intellectual functioning as confirmed by a valid full-scale IQ score of 70 and other neuropsychological testing—including Dr. Watson's prior testing. Mr. Johnson is at or below the bottom 2-percent of the population with regard to verbal learning and memory and is "well below the lowest one-percentile" of the population in language functioning. Ex. 1 at 11−14. Mr. Johnson presents considerable evidence of adaptive deficits throughout his life, including that he failed the second and ninth grades, was in special education classes, was unable to

effectively socialize or communicate with his peers about simple concepts, and lacked the capacity to grasp practical skills, such as navigating a bus route, basic personal hygiene, or counting change. *See* Ex. 1. Significant evidence exists that these deficits manifested before he turned 18, which is unsurprising in light of that fact that he was barely over 18 at the time of the offense. *Id.*

Mr. Johnson requests that this Court find that he is intellectually disabled and exempt from execution under *Atkins* and the Eighth and Fourteenth Amendments to the constitution.

## II.    Procedural history.

Mr. Johnson was convicted and sentenced to death in the 208th District Court of Harris County on June 27, 2007. On July 23, 2009, Mr. Johnson filed an Initial Application for Writ of Habeas Corpus pursuant to Texas Code of Criminal Procedure, Article 11.071, presenting eleven claims for relief. The Initial Application did not include a claim that Mr. Johnson was ineligible for the death penalty under *Atkins v. Virginia*. Without holding a hearing, the convicting court made findings of fact and conclusions of law recommending that relief be denied. The Texas Court of Criminal Appeals denied habeas relief on June 30, 2010. *Ex parte*

*Johnson*, No. WR-73, 600-01, 2010 WL 2617804 (Tex. Crim. App. June 30, 2010) (per curiam). Mr. Johnson's federal petition for writ of habeas corpus—which also did not contain an *Atkins* claim—was denied on August 19, 2013. *Johnson v. Stephens*, No. 4:11-CV-02466, 2013 WL 4482865 (S.D. Tex. 2013) (Doc. 19). This Court affirmed on July 2, 2015. *Johnson v. Stephens*, 617 F. App'x 293 (5th Cir. 2015). Mr. Johnson's petition for a writ of certiorari was denied on January 25, 2016. *Johnson v. Stephens*, 136 S. Ct. 980 (2016).

The trial court scheduled Mr. Johnson's execution for May 2, 2019. Thereafter, on January 15, 2019, Mr. Johnson wrote a letter to the federal district court in which he explained that he was told by other prisoners that his attorney, Patrick McCann, had a conflict of interest in representing him because he was also his state habeas lawyer. Doc. 65. On January 29, 2018, Mr. Johnson filed a *pro se* motion for appointment of counsel, Doc. 68, and on February 5, 2019, the Court appointed the FPD as co-counsel, Doc. 70.

Based on its review of the case documents and initial investigations, the FPD discovered sufficient evidence to support a motion for Mr. McCann's removal as Mr. Johnson's counsel. Doc. 76. The Director

6

opposed the motion, Doc. 81, and Mr. McCann filed his own motion under seal. On April 30, 2019, the district Court issued an order staying Mr. Johnson's execution, noting that "[t]he recent pleadings [] reveal troubling concerns about Johnson's current appointed legal representation which need resolution to preserve his rights before execution." Doc. 84 at 8. The Court stated it would schedule a hearing by separate order "to address the concerns raised in the motion to terminate Mr. McCann's appointed legal representation[.]" *Id.* at 9. Two days later, Mr. McCann moved to withdraw as Mr. Johnson's appointed counsel. Doc. 89.

On June 24, 2019, he filed a Rule 60(b) motion in federal district court asking to reopen the judgment against him. Doc. 95 (attached at Exhibit 6), which remains pending. Additionally, on August 6, 2019, he filed a subsequent application for writ of habeas corpus in state court raising the *Atkins* claim, among other issues, which remains pending.

As of today's date, Mr. Johnson's execution is scheduled for August 15, 2019.

### III.   Mr. Johnson meets the requirements of 28 U.S.C. § 2244.

When a petitioner seeks authorization to proceed on a second or successive habeas application, the circuit court performs an initial gatekeeping function. Pursuant to 28 U.S.C. § 2244(b)(3)(C), the circuit court "may authorize the filing of a second or successive application only if it determines that the application makes a prima facie showing that the application satisfies the requirements of this subsection." At the gatekeeping stage, a petitioner is not required to prove that he satisfies the criteria for a merits resolution of his successive habeas application, nor that he is entitled to relief on his proposed claims. Instead, the petitioner must establish "simply a sufficient showing of possible merit to warrant a fuller exploration by the district court" and that "in light of the documents submitted with the application it appears reasonably likely that the application satisfies the stringent requirement for the filing of a second or successive petition[.]" *In re Morris*, 328 F.3d 739, 740 (5th Cir. 2003) (quoting *Bennett v. United States*, 119 F.3d 468, 469–70 (7th Cir. 1997)).

If the circuit court authorizes a successive application, the district court then must ensure that the petitioner meets the requirement for

filing a successive application before ruling on the merits of the claim itself. 28 U.S.C. § 2244(b)(4); *In re Cathey*, 857 F.3d 221, 226 (5th Cir. 2017). First, the petitioner must make a showing that the claim presented in the successive application was not presented in a prior federal application. 28 U.S.C. § 2244(b)(1); *In re Campbell*, 750 F.3d 523, 530 (5th Cir. 2014). Second, for a claim that was not presented in a prior application to be authorized, a petitioner must show:

> (A) . . . the claim relies on a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
>
> (B)(i) the factual predicate for the claim could not have been discovered previously through the exercise of due diligence; and
>
> (ii) the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. 2244(b)(2). If those are met, the district court can proceed to the merits of the claim.

## A.    Mr. Johnson has not previously presented an *Atkins* claim in federal court.

The initial question for this Court is whether Mr. Johnson did not present an *Atkins* claim in his prior federal application. 28 U.S.C. §

2244(b)(1); *In re Campbell*, 750 F.3d at 530. Mr. Johnson's initial federal habeas petition did not contain an *Atkins* claim. While Mr. Johnson argued that he suffered from a mental illness "similar" to intellectual disability, it did not assert that he was intellectually disabled.[2]  Rather, it requested an extension of *Atkins*. *Johnson v. Stephens*, 617 F. App'x 293, 303–04 (5th Cir. 2015). The claim suggested that Mr. Johnson's death sentence be overturned under the logic of *Atkins* and *Roper v. Simmons*, 543 U.S. 551 (2005), because he "is a brain-damaged schizophrenic." Doc. 1.

Moreover, the Director has already taken the position that Mr. Johnson did not raise a claim that he was intellectually disabled, and thus exempt from execution, in his prior federal application. Doc. 11 at 28–29 (noting that the claim acknowledged that Mr. Johnson "does not presently fall within any of the current categorical exemptions from execution" and that his claim required an extension of the logic of *Atkins*). Therefore, Mr. Johnson has met his burden.

---

[2] The initial federal petition did refer to Mr. Johnson as "mentally challenged" and "handicapped" in the context of a competency argument. Doc. 1 at 18.

## B.     Mr. Johnson is intellectually disabled.

To be intellectually disabled, an individual must establish (1) deficits in intellectual functioning, (2) deficits in adaptive functioning, and (3) the onset of deficits during the developmental period. DSM−5 at 33. Mr. Johnson meets all three criteria.

Under the current medical diagnostic framework as described in the DSM−5, Mr. Johnson is intellectually disabled. Dr. Daniel Martell undertook an extensive evaluation of Mr. Johnson, including reviewing multiple IQ scores, conducting neuropsychological testing, and conducting multiple clinical interviews with witnesses and Mr. Johnson. Ex. 1. Based on his analysis and clinical judgment, Dr. Martell concluded that Mr. Johnson has deficits in intellectual functioning as confirmed by his IQ score of 70 on the WAIS-IV, IQ scores from tests administered pretrial, and the clear cognitive deficits displayed on multiple neuropsychological tests. *Id.* at 23. Moreover, while Mr. Johnson must establish deficits in only one domain, Dr. Martell found deficits in adaptive functioning in all three domains—social, conceptual, and practical—identified in the DSM−5. *Id.* at 45. Mr. Johnson has severe language deficits, including a pronounced stutter and use of nonsense

11

words. *Id.* at 24–27. He has struggled socially throughout his life as he was noticeably immature for his age, unable to make friends, and incapable of reading social cues. *Id.* at 28–32. And Mr. Johnson struggled with practical daily tasks. *Id.* at 33–44. His family had to remind him to wash with soap daily. *Id.* at 39. He could not handle basic money management and was taken advantage of because of his inability to count change. *Id.* at 35. Finally, Mr. Johnson's deficits manifested in the developmental period, confirmed by numerous witnesses and school records. *Id.* at 45.

### 1. Mr. Johnson has limitations in intellectual functioning.

The first prong of an intellectual disability diagnosis is deficits in intellectual functioning. This includes deficits in reasoning, problem solving, planning, abstract thinking, judgment, academic learning, and learning from experience. DSM–5 at 33. Compared to its predecessor, the DSM–5 focuses less on specific IQ scores and more on clinical judgment. DSM–5 at 33–37; *see also Hernandez v. Stephens*, 537 F. App'x 531, 533 n. 1 (5th Cir. 2013) ("The American Psychiatric Association's fifth edition of the Diagnostic and Statistical Manual of Mental Disorders (DSM–5), uses the term 'intellectual disability (intellectual developmental

disorder)' in place of the term 'mental retardation' and de-emphasizes IQ scores as determinants of this condition.").

The DSM−5 does so because IQ scores are "an approximation of conceptual functioning but may be insufficient to assess reasoning in real-life situations and mastery of practical tasks." DSM−5 at 37. Thus, an individual with an IQ score above 70 may still qualify as intellectually disabled due to deficits in adaptive functioning. *Id.* The DSM−5's emphasis on clinical judgment is a departure from previous medical diagnostic norms, which defined deficits in intellectual functioning only in relation to IQ score. DSM−5 at 37; *see also* Ex. 1 at 16 ("The DSM−5 definition of ID encourages a more comprehensive view of the individual than was true under the fourth edition, DSM-IV.").

Because there is statistical error and uncertainty in any assessment of human behavior, intellectual functioning is best represented by a score range, rather than a single number. DSM−5 at 37. In addition to the IQ score itself, a clinician should consider factors that affect the score, including the practice effect and Flynn effect. *Id.* The DSM−5 also advises that cognitive profiles based on neuropsychological

tests are "more useful for understanding intellectual abilities than a single IQ score." *See* DSM−5 at 37.

Mr. Johnson achieved a full-scale IQ of 70 on the WAIS-IV and demonstrates neuropsychological impairments in speech and language, executive functioning, and memory. Ex. 1 at 18. This IQ score, combined with his poor performance on neuropsychological testing and poor record of academic achievement, establish that Mr. Johnson meets prong one of an ID diagnosis. *Id.* at 23.

In 2019, Mr. Johnson was administered the WAIS-IV intelligence test—a standardized measure. Ex. 1 at 18. It was individually administered by Dr. Greg Hupp and later reviewed by Dr. Martell. *Id.* at 2, 18. Mr. Johnson scored well on the effort scales, indicating that he was not malingering. Ex. 2 at 2, 5−6. Accordingly, the test score meets all of the requirements for a valid and reliable IQ score under the current medical standards. Ex. 1 at 19. Mr. Johnson's IQ score was a 70, squarely in the range of intellectual disability.

Supporting this IQ score are the numerous intellectual functioning impairments identified by neuropsychological testing. Dr. Martell conducted a battery of neuropsychological measures and, after

concluding that they provided a valid indication of Mr. Johnson's cognitive functioning, determined that Mr. Johnson has multiple intellectual deficits beyond just the IQ score. Ex. 1 at 11. First, Mr. Johnson is at or below the bottom 2-percent of the population with regard to verbal learning and memory. *Id.* Second, the testing revealed that Mr. Johnson very likely has frontal lobe impairment and struggles with executive functioning. *Id.* at 13.[3] Dr. Martell also observed significant impairments in Mr. Johnson's language functioning, including a pronounced stutter, mispronounced or nonsense words, and "severe impairment in his ability to name common objects[.]" *Id.* at 14. Mr. Johnson's score in language functioning placed him "well below the lowest one-percentile" of the population. *Id.* Finally, Mr. Johnson's motor-deficit testing demonstrated that his left-hand performance was significantly impaired, indicating right hemisphere brain dysfunction, and he exhibited mild to moderate impairments in his ability to correctly perceive the affect (or emotional expression) of others. *Id.* at 15.

---

[3] Dr. Ruben Gur and Dr. Richard Dudley likewise found frontal lobe damage at the time of Mr. Johnson's trial. *See* 31 RR 240; 32 RR 186.

Based on his clinical judgment, Dr. Martell concluded that Mr. Johnson's IQ scores, in conjunction with the numerous impairments documented through neuropsychological testing, demonstrate that Mr. Johnson has deficits in intellectual functioning sufficient to meet prong one of the intellectual disability diagnosis. *Id.* at 23.

Mr. Johnson scored outside of the typical ID range on two tests administered by Dr. Dale Watson in 2007. Dr. Watson's testing showed an IQ of 78 on the Stanford-Binet-5 and an 88 on the WAIS-III, administered shortly after the Stanford-Binet. Ex. 3 at ¶4. At that time, Dr. Watson believed there was no need to proceed to evaluating Mr. Johnson's adaptive functioning because the DSM−IV strictly defined deficits in intellectual functioning as a full-scale IQ of 75 or below. *Id.* However, Dr. Watson would no longer testify that Mr. Johnson is not intellectually disabled based on those scores. *Id.* The current medical diagnostic framework established in the DSM−5 specifically requires clinicians to exercise clinical judgment in making an ID diagnosis because an IQ score "may be insufficient" to assess a person's actual functioning. DSM−5 at 37. Thus, as Dr. Watson now recognizes, the current medical standard dictates clinical judgment, real-world

behaviors, and neuropsychological testing over strict IQ cutoffs. Ex. 3 at 2; DSM−5 at 37.

Moreover, Dr. Martell reviewed Dr. Watson's 2007 testing and found that Mr. Johnson's score of 78 on the Stanford-Binet 5 does "place Mr. Johnson in the clinical range for a diagnosis of Intellectual Disability under the DSM−5 criteria, particularly in light of his adaptive deficits[.]" Ex. 1 at 17. Dr. Martell also reviewed Mr. Johnson's score of 88 on the WAIS-III and determined that the difference in the two 2007 scores can be explained by the different structure in the two intelligence tests. *Id.* at 18. In fact, 25% of individuals will receive an IQ score more than 10 points higher when taking another test. *Id.*

Mr. Johnson's significantly sub-average IQ score, combined with the extensive deficits he exhibits in his neuropsychological testing, leads Dr. Martell to conclude that Mr. Johnson suffers deficits in intellectual functioning under the definition articulated in the DSM−5. Ex. 1 at 23. And because Mr. Johnson has a qualifying IQ score, an evaluation of his adaptive functioning is mandatory. *Moore v. Texas*, 137 S. Ct. 1039, 1049 (2017) (*citing Hall v. Florida*, 572 U.S. 701, 723 (2014)).

## 2. Mr. Johnson has deficits in adaptive functioning.

The second prong that an individual must meet for an intellectual disability diagnosis is deficits in adaptive functioning, which is a measure of how well the individual meets community standards of personal independence and social responsibility when compared to other people of similar age and sociocultural background. DSM–5 at 33. Under the current standards delineated in the DSM–5, deficits in adaptive functioning are given more weight than IQ score in determining whether an individual is intellectually disabled. *Id.* at 37.

Adaptive functioning is measured over three domains: conceptual, social, and practical. The conceptual (or academic) domain involves competence in memory, language, reading, writing, math reasoning, acquisition of practical knowledge, problem solving, and judgment in novel situations, among others. The social domain involves awareness of others' thoughts, feelings, and experiences; empathy; interpersonal communication skills; friendship abilities; and social judgment, among others. The practical domain involves learning and self-management of behavior, and school and work task organization, among others. *Id.* Deficits or significant limitations in only one of the three adaptive

functioning domains—conceptual, social, and practical—are needed to confirm a diagnosis of ID. *Id.* at 38.

Dr. Martell evaluated Mr. Johnson and concluded that Mr. Johnson exhibited significant deficits in all three domains of adaptive functioning, as defined by the DSM−5. Ex. 1 at 45. In reaching his conclusion, Dr. Martell interviewed witnesses and reviewed declarations from Mr. Johnson's family, former coworkers, and a teacher; the trial testimony from the punishment phase; and numerous educational and medical records. *Id.* at 2−3.

### a. Conceptual domain.

The conceptual domain includes skills like reading, writing, and arithmetic, as well as abstract thinking, such as planning and memorization. DSM−5 at 37. Dr. Martell found both empirical and anecdotal evidence that Mr. Johnson has significant deficits in functional academic skills, language skills, and concept formation and self-direction. Ex. 1 at 23−24.

Mr. Johnson repeated the second grade and his teacher during the second year, Annie L. Batiste, observed that Mr. Johnson struggled with

reading comprehension and problem solving. *Id.* at 24.[4] Even though Mr. Johnson was older than the other children in the class, he "had a hard time completing what he needed to do in class" and was in speech classes for his articulatory problems. *Id.* At times he could not get words out or would use the wrong word. *Id.* Ms. Batiste's observations of Mr. Johnson are corroborated by his school records, which show that he was in special education from elementary school continuing into high school. *Id.*

In high school, and during his second attempt at the ninth grade, Mr. Johnson still functioned at a sixth-grade level and was in special education in all subjects even though he should have been in the eleventh grade. *Id.* at 25. His high school record noted his need for support in multiple adaptive functioning areas including home and family living, career skills development, independent living, self-help activities, transportation training, money management, social skills, and driver's license training. *Id.*

Through his interview with Mr. Johnson's sister, Travalia, Dr. Martell learned that the word confusion he had observed in his neuropsychological testing had begun during Mr. Johnson's childhood.

---

[4] Supporting lay witness statements are attached as Exhibit 5.

Mr. Johnson's family noticed that Mr. Johnson needed them to repeat things several times before he would understand. *Id.* at 25–26. He also had a stutter and mispronounced words, such as calling a "spoon" a "boon." *Id.* at 26. The family sometimes teased Mr. Johnson for being "slow" and found that he "could barely read[.]" *Id.* at 27. Dr. Martell also recognized that Mr. Johnson had deficits in "receptive language skill," meaning that he could not understand what others told him.

Mr. Johnson admitted that he did not like school because other children called him "dumb" and he could not keep up, which was "fusteratin'" to him. *Id.* at 27. Mr. Johnson's younger sister frequently did his homework for him because he could not complete even special education assignments. *Id.* at 25. His teachers sometimes called Mr. Johnson's older sister out of class to help him because Mr. Johnson would become emotional when he could not handle the assignments. *Id.* at 26.

Dr. Martell concluded that the struggles revealed by Mr. Johnson's academic records, and confirmed by the neuropsychological testing, as well as the description of Mr. Johnson's inability to read or communicate from multiple witnesses, demonstrate deficits in the conceptual domain as defined by the DSM–5. *Id.* at 28.

### b. Social domain.

The social domain involves communication skills, friendship abilities, and social judgment. DSM−5 at 37. Individuals with deficits in this domain tend to be more immature than others of the same age, struggle regulating emotion, and may be naïve and easily taken advantage of. *Id*. at 34−36. Throughout his life, Mr. Johnson has struggled to make friends, was noticeably immature when compared to peers, and was easily taken advantage of.

Multiple witnesses reported that Mr. Johnson struggled socially. As a child, Mr. Johnson was bullied by other kids for being slow. Ex. 1 at 28. Despite the bullying, Mr. Johnson would tell his sister, Sheree, that he had made friends. *Id*. If another kid told him they were friends "he would automatically believe it[,] although in reality he barely knew the person." *Id*. In interviews with Dr. Martell, Mr. Johnson's mother and younger sister, Marquette, noted that Mr. Johnson did not understand jokes because "[h]e took it literal." *Id*. at 28. Even when someone broke the joke down and explained it, he did not understand. *Id*. at 29.

Mr. Johnson has never been able to maintain a conversation, preferring to just agree, wanting the other person to do most of the

talking. *Id.* He cannot maintain eye contact. *Id.* When Mr. Johnson worked at Jack-in-the-Box as a teen, his social ineptitude meant that he could not handle communicating with customers. *Id.* at 30.

Growing up, Mr. Johnson was socially immature. He did not have friends and preferred to watch cartoons. *Id.* at 29. He mostly stayed home because he was "awkward in social situations." *Id.* His social deficits often meant that Mr. Johnson was victimized by bullies. Other kids "just beat on him" and he even injured himself running from them. *Id.* at 30. His teacher remembered that he was never "part of the group" with other kids and was abused by them because he "was gullible." *Id.* at 30−31. Other kids would tell Mr. Johnson to get out of his seat when the teacher left the room and then tattle as soon as she came back. *Id.* at 31; *see also* DSM−5 at 38 ("Gullibility is often a feature, involving naiveté in social situations and a tendency for being led by others . . . [which] may result in exploitation by others[.]"). His teacher also saw that Mr. Johnson struggled to control his emotions. He would clench his fists and cry for five minutes every day in class. *Id.* at 30. He could not sit still. *Id.*[5]

---

[5] Gullibility and inability to regulate emotion are specifically identified in the DSM−5 as particularly "important in criminal cases, including Atkins-type hearings involving the death penalty." DSM−5 at 38.

As a result, Mr. Johnson often felt left out. *Id.* at 32. He had trouble understanding what was happening around him and preferred to be alone so that no one would make fun of him. *Id.* Dr. Martell also noted that these social deficits mirror his findings in the neuropsychological testing. He administered the Comprehensive Affect Testing System to Mr. Johnson which tests one's ability to recognize and correctly identify the emotional expressions of others based on visual facial and auditory language cues. *Id.* at 32. Mr. Johnson exhibited mild to moderately severe impairment in all areas of this test. *Id.*

Dr. Martell determined that Mr. Johnson has mild to moderate impairment in the social domain as he struggles with spoken language, gullibility, and regulating emotion, Ex. 1 at 32−33, struggled to develop and maintain relationships, and was ostracized by others who perceived him as "slow." *Id.* at 28−33.

### c. Practical domain.

The practical domain involves personal care, money management, and job responsibilities. DSM−5 at 37. Dr. Martell concluded that Mr. Johnson displays significant deficits in this area because he could not

follow bus or walking directions, struggles with personal hygiene, and cannot manage money or his own affairs.

Through interviews, Dr. Martell learned that Mr. Johnson's inability to "keep up" meant that he was often "short-changed." Ex. 1 at 33. He could not keep track of his money, which led others to take advantage of him. For example, when Mr. Johnson received an income tax check for $320, a check cashing store gave him $32. *Id.* at 35. Mr. Johnson did not realize the difference and his sister directed him to go back and get his money. *Id.* His family knew that people took advantage of Mr. Johnson: "You couldn't trust him to come out of the store with the right change. People could see how he was and they took advantage of that." *Id.* at 33.

As a child, Mr. Johnson could not remember the rules of a simple card game like Old Maid. *Id.* at 33. No one wanted Mr. Johnson on their team when it came to sports because he could not keep up. *Id.* at 34. He also could not keep score during the game. *Id.* Mr. Johnson needed help ordering at restaurants because he struggled to read the menu and suffered from anxiety in public. *Id.* at 34. As a teen, he could not read a user-guide to learn how to use his cell phone. *Id.* Even his first "flip phone"

was too difficult for him to navigate. *Id.* at 35. His sisters showed him how to set an alarm on the phone so he would get up on time but he would forget how to do it. *Id.* at 34. They took to setting the alarms for him. *Id.* Mr. Johnson struggled so much with reading that "he would just try to guess." *Id.* at 36. He avoided texting, telling people just to call. *Id.* at 42. He once tried to put together an entertainment center for his mother but could not understand the instructions and it collapsed within a week. *Id.* at 36.

Although she tried to give Mr. Johnson chores, his mother realized that he had limits. He could put dishes in the dishwasher but got confused by the buttons. *Id.* at 39. He could not work the washer and dryer so his mother washed his clothes for him. *Id.* She limited his tasks to taking out the trash and sweeping the porch. *Id.*

Mr. Johnson often endangered himself by lack of common sense. He would chase a ball into the street without watching for cars and answer the door without checking who it was. *Id.* at 34. He never remembered to use a seat belt. *Id.* Mr. Johnson would do things that everyone else knew not to do, such as lighting a barbecue pit with his head inside the pit, burning himself. *Id.* at 35. At age 17, after he flooded his mother's house

by breaking a pipe connected to the icemaker, his family no longer trusted him home alone. *Id.* at 36.

Multiple witnesses noticed that Mr. Johnson could not manage directions throughout his life. As a kid, he needed one of his sisters to take him to and from school because he would get lost. *Id.* at 35. Even as a teenager, he could not manage a bus route and took to walking everywhere. *Id.* at 42. When he did take the bus, he was sometimes able to get help from "nice bus drivers" who told him where to stand for the next bus and told him to ask the driver to let him know when to get off. *Id.* at 43. He once forgot which stop to get off at and came home from work four hours late. *Id.* at 35. When Mr. Johnson's younger sister, Marquette, once asked him to take her to school, he got lost. *Id.* at 40. She decided to walk Mr. Johnson back home to be sure that he made it. *Id.* His mother only sent him to the store with one of his sisters as an escort because he so often got lost. *Id.* at 39.

Mr. Johnson had poor personal hygiene. Witnesses informed Dr. Martell that Mr. Johnson had significant issues with halitosis and dressing himself. He needed help until he was 10 or 11 years old because he could not put on his shoes and socks the right way. *Id.* at 39. Mr.

Johnson also needed help with using soap and shampoo until he was a teen. *Id.* His mother made him come with her into the women's restroom when they were out in public to make sure he washed his hands. *Id.* When he was older, he wanted to "starch" his pants to look like the other guys in the neighborhood and would mix flour and water, apply them to his pants, and wear them until they would "reek." *Id.* at 36, 43. Mr. Johnson admitted that people would complain to him that he smelled and tell him to brush his teeth. *Id.* at 42–43.

When it came to self-management, Mr. Johnson needed significant support. He needed help completing a job application. *Id.* at 38. When he had a job, he would hand his paychecks over to his girlfriend to manage because he did not have a bank account and could not keep track of his money. *Id.* As an adult, he did not understand what a credit card is, asking "is that what you get at the bank?" *Id.* at 44. When Mr. Johnson worked at Jack-in-the-Box, his supervisor had to help him because he was never able to pass periodic company tests about service, food portions, or customer service. *Id.* at 41. It took him longer than other employees to catch on. *Id.* His manager was his girlfriend's mother and she knew his "situation" and "looked out for him." *Id.* at 40. He worked in the back at

Jack-in-the-Box because he lacked the skills to work the cash register or interact with customers. *Id.* at 37. Even there, he was at risk, burning himself on the fryer. *Id.* at 34.

Based on this evidence, Dr. Martell concluded that Mr. Johnson has deficits in the practical domain of adaptive functioning because he struggles with self-care, could not manage routine household tasks, and needed significant support with managing his job and money. *Id.* at 44. Moreover, with regard to all of Mr. Johnson's adaptive deficits, Dr. Martell concluded that his "adaptive impairments are clearly related to his underlying cognitive limitations. There is substantial 'convergent validity' from anecdotal, contemporaneous, and empirical data sources supporting the conclusion that Mr. Johnson functions adaptively in the range of Intellectual Disability, which meets the second diagnostic prong." *Id.* at 45.

### 3. The onset of the disorder was during the developmental period.

The third prong of an intellectual disability diagnosis is onset of deficits during the developmental period, which is defined as before the age of 18. The DSM−5 does not require that the deficits be present at birth or even be biomedical in nature.

Based on various witness declarations, trial testimony, and records, Dr. Martell has concluded that Mr. Johnson's deficits began before age 18. Ex. 1 at 45. Dr. Martell also found that the presence of head injuries and other risk factors for intellectual disability that occurred during Mr. Johnson's developmental period further supported the age of onset as pre-18. *Id.*[6]

### 4. Mr. Johnson application is timely or he can establish equitable tolling.[7]

Mr. Johnson has numerous arguments that allow him to establish the timeliness of his application. Section 2244(d) creates a one-year statute of limitations for bringing claims in a federal habeas corpus petition, which triggers based on the latest of a variety of conditions. The

---

[6] For instance, Dr. Ruben Gur testified at Mr. Johnson's trial that MRI results showed the brain tissue in Mr. Johnson's left frontal lobe is three standard deviations lower than in the normal brain, which you find in less than one-tenth of one percent of the population. 30 RR 240.

[7] Because it is a fact bound question, the district court has the tools at its disposal—namely, the ability to hold an evidentiary hearing—to best address the question whether Mr. Johnson's *Atkins* claim meets the federal statute of limitations. *In re Campbell*, 750 F.3d 523, 533–34 (5th Cir. 2014). This question can be heavily dependent on the merits of the claim itself, and thus the merits of the claim should be adjudicated first. *See Rivera v. Quarterman*, 505 F.3d 349, 355 (5th Cir. 2007) ("[A]nswering whether Rivera is retarded [*sic*] is logically antecedent—if not a core element itself—to determining whether equitable tolling is available."). As such, this Court should delay a determination of the statute of limitations issue until after the fact-intensive inquiry regarding whether Mr. Johnson is intellectually disabled.

limitations period for Mr. Johnson's application runs from "the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence." 28 U.S.C. § 2244(d)(1)(D). Because the factual predicate for the claim relies on the publication of the DSM–5, it would not start running until Mr. Johnson should have been placed on notice of the salient changes in that manual, thus making the claim available.

Moreover, Mr. Johnson may establish equitable tolling for any claim that may fall outside the limitations period. Equitable tolling is a flexible, judicially-created remedy that is evaluated on the specific circumstances of the case, and which requires a petitioner to show that he has pursued his rights diligently, but extraordinary circumstances stood in the way of a timely filing. Such extraordinary circumstances can include "an attorney's failure to satisfy professional standards of care." *Holland v. Florida*, 560 U.S. 631, 649 (2010); *see also id.* at 651 ("[A]t least sometimes, professional misconduct that fails to meet the Eleventh Circuit's standard could nonetheless amount to egregious behavior and create an extraordinary circumstance that warrants equitable tolling."); *Manning v. Epps*, 688 F.3d 177, 183 (5th Cir. 2012) (applying the two-

prong *Holland* standard to the petitioner's argument that equitable tolling was warranted). The fact-sensitive inquiry attendant to equitable tolling arguments is one that is best resolved at an evidentiary hearing. *See Holland*, 560 U.S. at 654.

Equitable tolling is warranted due to Mr. Johnson's deficits. Moreover, equitable tolling is warranted due to his prior representation by conflicted counsel. *See* Ex. 6. Mr. Johnson diligently pursued his rights by timely requesting, *pro se*, the appointment of conflict-free counsel and timely seeking to reopen the judgment once he became aware of the conflict. In other filings, he has provided significant support for the proposition that his prior attorneys' actions in his case fell far below the standards of professional care. *See*, *e.g.*, Doc. 95 at Ex. 2 (Schuwerk Declaration). He has also shown several extraordinary circumstances as outlined in his Rule 60(b) Motion, which weigh in favor of both reopening the judgment and finding that equitable tolling is warranted. *See* Ex. 6.

*Atkins* claims may also fall into a class for which the statute of limitations can be bypassed based on a showing of actual innocence of the death penalty. In *McQuiggin v. Perkins*, the Supreme Court held that actual innocence of the crime, if proven, establishes a gateway to present

constitutional claims even if the statute of limitations had otherwise expired. 569 U.S. 383 (2013). The *Perkins* court noted that the miscarriage of justice exception "survived AEDPA's passage" and has been used to overcome various procedural hurdles. *Id.* at 392–93. *Perkins* applied the logic of *Schulp v. Delo*, 513 U.S. 298 (1995), which allows petitioners to overcome procedural default of a claim upon a showing of actual innocence and extends the rationale to the federal statute of limitations.

To the best of Mr. Johnson's knowledge, neither the Supreme Court nor the Fifth Circuit has resolved the question whether *Perkins* applies to claims of actual innocence of the death penalty, such as an *Atkins* claim. *See Tamayo v. Stephens*, 740 F.3d 986, 990 (5th Cir. 2014) (explaining that the application of *Perkins* to actual innocence of the death penalty was "a question we do not decide here[.]").[8] *Schulp* itself relies heavily on the Supreme Court's opinion in *Sawyer v. Whitley*, 505 U.S. 333 (1992), which involved the excuse of procedural default based

---

[8] In *Henderson v. Thaler*, 626 F.3d 773, 781 (5th Cir. 2010), the court held that it would not create an actual innocence of the death penalty exception to the statute of limitations. However, this decision predated *Perkins*, and the question was explicitly left open in *Tamayo*.

on actual innocence of the death penalty. Because the *Schlup* standard applies to the statute of limitations period, so should the *Sawyer* standard. As such, a plausible argument exists that the statute of limitations can be bypassed when a petitioner is able to establish actual innocence of the death penalty—such as showing that he is intellectually disabled.

C.     **Mr. Johnson's *Atkins* claim was previously unavailable under 28 U.S.C. 2244(b)(2)(A), because his *Atkins* claim required the publication of the DSM-5.**

To receive authorization to proceed under 28 U.S.C. 2244(b)(2)(A), Mr. Johnson must show that his *Atkins* claim "relies on a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable." The Fifth Circuit has repeatedly held that an *Atkins* claim meets this requirement. *See, e.g.*, *In re Campbell*, 750 F.3d at 530; *Mathis v. Thaler*, 616 F.3d 461, 467 (5th Cir. 2010); *Morris v. Dretke*, 413 F.3d 484, 486–87 (5th Cir. 2005). Thus, the question becomes whether Mr. Johnson's *Atkins* claim was previously unavailable.

The fact that *Atkins* was issued before Mr. Johnson filed his initial federal petition for writ of habeas corpus is not dispositive of this

question. *In re Cathey*, 857 F.3d at 229–34. To receive authorization to proceed, Mr. Johnson must present "sufficiently cogent arguments" that his *Atkins* claim was "unavailable at the time of his first petition and its disposition." *Id.* at 230 (quotations omitted). If a rule becomes available to a petitioner while his first federal petition is pending, this Court assesses whether it was "feasible to amend his or her pending petition to include the new claim." *Id.* at 229 *(*quoting *In re Wood*, 648 F. App'x 388, 391 (5th Cir. 2016)). It is not feasible to amend when, *inter alia*, the claim is "functionally unavailable" based on deficient representation in the initial federal habeas proceeding. *Id.*  Cases that fall into "a gray area of previous unavailability despite technical availability" should receive authorization to proceed in district court. *Id.* at 230.

### 1. Under the controlling precedent of *In re Cathey*, Mr. Johnson's *Atkins* claim was previously unavailable.

In *Cathey*, the initial federal petition was filed nearly two years after the *Atkins* decision and did not include an *Atkins* claim. 857 F.3d at 227. Two justifications were offered to explain why the *Atkins* claim was not previously available. The first explanation was that the Flynn Effect—which suggests that IQ scores should be reduced by .3 points per year from the year the test was normed—was not considered by courts

until "at least 2005," the year after Mr. Cathey filed his petition. *Id.* Mr. Cathey had a 77 IQ score, and was unable to pursue a viable *Atkins* claim until the courts recognized the validity of the Flynn Effect. *Id.* Second, evidence came to light in 2010 that Mr. Cathey had previously received an IQ score of "below 73" from TDCJ. *Id.* at 232.

The Director opposed authorization in *Cathey*. Among other arguments, she noted that the "Flynn Effect was recognized for at least twenty years before Cathey's first federal petition" and that the documents referencing a "below 73" IQ score did not explain the basis for that score. *Id.* at 228. Despite that, the court found in *Cathey* that the petitioner had made a prima facie showing that it was not feasible to amend his petition to include an *Atkins* claim. The Court placed heavy emphasis on the fact that the petitioner was not required to *satisfy* 28 U.S.C. 2244(b)(2) at the authorization stage, but rather to make a "sufficient showing of possible merit." *Id.* at 233 (citations omitted). In evaluating the availability of the Flynn Effect, the Court focused on the date when Texas courts, rather that the medical community, showed awareness of the phenomenon. *Id.* at 231. Because of the arguments

presented, the case fell into a "gray area" and deserved encouragement to proceed in the district court. *Id.* at 230.

Under the controlling precedent in *Cathey*, Mr. Johnson's *Atkins* claim was unavailable at the time he filed his initial federal petition. Similar to the petitioner in *Cathey*, Mr. Johnson's intellectual disability claim was not available to him at the time he filed his initial federal petition under then-current standards for diagnosing the disorder.[9] Mr. Cathey required, in part, the acceptance of the Flynn Effect for his *Atkins* claim to be available; Mr. Johnson's claim hinges on the publication of the DSM-5 to make his claim available. In light of what the American Psychiatric Association ("APA") labels "significant changes"[10] to the diagnostic criteria as reflected in the DSM-5, Mr. Johnson is intellectually disabled, whereas under the prior version of the manual—which reflected outdated diagnostic criteria—he is not. As the Supreme Court has repeatedly made clear, reviewing courts must consider the *current* medical framework when determining whether an individual is

---

[9] Mr. Johnson is not arguing that he was not intellectually disabled at the time of the offense in question. Instead, his argument is that current prevailing professional norms establish that he was intellectually disabled at the time of the offense, although they may not have prior to the publication of the DSM-5.

[10] Ex. 4.

intellectually disabled. *See Moore v. Texas*, 137 S. Ct. 1039 (2017) (requiring courts to consider current medical standards when determining whether an individual is intellectually disabled); *Hall v. Florida*, 572 U.S. 701 (2014) (same).

At the time of Mr. Johnson's trial and the filing of his federal habeas petition, the DSM-IV-TR was the most recent APA manual outlining the standard for diagnosing intellectual disability, which was then known as mental retardation. The DSM-IV-TR criteria required: (1) significantly sub average general intellectual functioning, an IQ of about 70 or below on an individually administered IQ test; (2) accompanied by significant limitations in adaptive functioning in at least two skill areas; and (3) onset before age 18. Ex. 3 at ¶5. Mr. Johnson was administered two IQ tests at the time of his trial, but he did not meet the then-prevailing first prong of an ID diagnosis, and thus a comprehensive intellectual disability evaluation was not undertaken. 31 RR 263.

The DSM−5, published on May 18, 2013, made "significant changes" to the diagnostic criteria for intellectual disability. Ex. 4. In particular, the DSM−5 places heightened focus on adaptive functioning deficits and lesser emphasis on IQ scores. *Id.* (noting that "the severity of

impairment [is] based on adaptive functioning rather than IQ test scores alone."). In fact, the DSM−5 went so far as to remove IQ scores from the diagnostic criteria, while noting that IQ testing should remain part of the overall assessment. *Id.*; *see also Hernandez v. Stephens*, 537 F. App'x 531, 533 n.1 (5th Cir. 2013) ("The American Psychiatric Association's fifth edition of the Diagnostic and Statistical Manual of Mental Disorders (DSM−5), uses the term 'intellectual disability (intellectual developmental disorder)' in place of the term 'mental retardation' and de-emphasizes IQ scores as determinants of this condition."). The "DSM-5 ensures that [IQ scores] are not overemphasized as the defining factor of a person's overall ability, without adequately considering functioning levels." Ex. 4 at 1−2. The new diagnostic criteria account for the fact that "a person with an IQ score above 70 may have such severe adaptive behavior problems in social judgment, social understanding, and other areas of adaptive functioning that the person's actual functioning is comparable to that of individuals with lower IQ scores." Ex. 3 at ¶7 (quoting DSM−5 at 33).

Dr. Martell explains that the DSM−5 "encourages a more comprehensive view of the individual" as compared to the prior version

of the manual. Ex. 1 at 16. In the newer manual, "[m]ore importance is placed on clinical judgment with regard to the presence of adaptive deficits, and less emphasis is placed on bright-line IQ cutoff scores." *Id.*; *see also id.* (The DSM-V places "significantly more emphasis on adaptive functioning" as the "hallmark indicia of intellectual disability."). These changes reflect the medical community's evolving understanding that individual cognitive profiles based on neuropsychological testing are more useful for understanding intellectual abilities than IQ test scores. *Id.* (quoting DSM-5 at 37).[11]

In light of these changes to the diagnostic criteria for intellectual disability, Dr. Watson no longer stands by his testimony that an assessment of Mr. Johnson's adaptive functioning deficits is not necessary in light of his IQ scores. Ex. 3 at ¶9. And both of the experts who have met with and evaluated Mr. Johnson under the currently prevailing norms for diagnosing intellectual disability have concluded

---

[11] While the DSM−5 modified the criteria for the diagnosis, this does not mean that more individuals now qualify for the disorder than did under the DSM-IV-TR. In fact, one study found a 9% reduction in its sample size for those that qualified for the disorder under the DSM-5 as opposed to the DSM-IV-TR. *See* Aimilia Papazoglou et al., *To ID or Not to ID? Changes in Classification Rates of Intellectual Disability Using* DSM−5, 52 Intellectual and Developmental Disabilities 165 (June 2014).

that he is intellectually disabled. Ex. 1; Ex. 2. Thus, the changes to the diagnostic criteria for intellectual disability in the DSM−5 have a clear and direct impact on the availability of an *Atkins* claim; Mr. Johnson would not have received a diagnosis of intellectual disability under the prior manual, but he has received such a diagnosis from two experts under the current version.

Moreover, Mr. Johnson's recent full-scale IQ score of 70 provides additional support for a finding that the *Atkins* claim was previously unavailable. In *Cathey*, the court held that vague notations on two TDCJ documents listing the petitioner's IQ score as "below 73," without an explanation for the basis of those notations, supported a finding that the petitioner's *Atkins* claim was previously unavailable. 857 F.3d at 232–33. If a TDCJ notation of an IQ score below 73 supported a prima facie finding that Mr. Cathey's *Atkins* claim was previously unavailable, then certainly Mr. Johnson's report of a full-scale score of 70 on a recent administration of the WAIS-IV also supports such a finding.[12]

---

[12] To be clear, Mr. Johnson is not suggesting that IQ testing conducted after the disposition of the initial federal habeas petition, standing alone, is enough to clear the "previously unavailable" hurdle of the statute. However, just as in *Cathey*, this testing supports the argument of previously unavailability. 857 F.3d at 233.

## 2. It was not feasible for Mr. Johnson to amend his *Atkins* claim into the initial petition.

It was not feasible for Mr. Johnson to amend his initial federal petition to include the *Atkins* claim. *See In re Cathey*, 857 F.3d at 229 (explaining that if a rule becomes available during the pendency of the initial petition in district court, a court looks to whether it would have been "feasible to amend his or her pending petition to include the new claim.") (citations omitted). The DSM−5 was published on May 18, 2013, three months prior to the denial of Mr. Johnson's federal habeas petition on August 19, 2013. DE 19.[13] On August 2, 2013, the Fifth Circuit issued its opinion in *Hernandez v. Stephens*, 537 F. App'x. 531, which was—to the best of Mr. Johnson's knowledge—the first time a Texas court mentioned the DSM−5. *Id.* at 533, n. 1. Even assuming, *arguendo*, that a footnote in an unpublished opinion should have placed Mr. Johnson on notice of the new availability of an *Atkins* claim, it would not have been feasible to amend that claim into his initial petition in the seventeen days remaining before the petition's denial.[14]

---

[13] The district court denied the petition at this point with the exception of one claim, which it ordered further briefing on.

[14] Evaluating an individual for intellectual disability is a time-consuming process. It requires a qualified professional to review voluminous documents, meet

Furthermore, Mr. Johnson can make a showing that "his representation in the initial federal habeas proceedings was so deficient as to render the *Atkins* claim functionally unavailable[.]" *See In re Cathey*, 857 F.3d at 229. Mr. Johnson has a Rule 60(b) motion to reopen the judgement against him pending in the district court, premised upon a conflict of interest between him and his former federal counsel and the resulting deprivation of his statutory right to adequate representation. Ex. 6. The pending motion argues that Mr. Johnson's former court-appointed attorney, Patrick F. McCann, operated under a significant conflict of interest that arose no later than May 28, 2013, when the Supreme Court issued its opinion in *Trevino v. Thaler*, 569 U.S. 413 (2013), as he served as both state and federal habeas counsel.

Not only did Mr. McCann fail to inform Mr. Johnson of the conflict of the interest, but he took a number of steps in direct contravention of Mr. Johnson's best interests, including: (1) attempting to amend claims into the federal petition by invoking *Martinez* and *Trevino* to excuse the default of those claims while simultaneously arguing that he had not

_____

with the individual in person, and often conduct other interviews of those that know the individual to gain historical insight into their functioning. It is not reasonable to expect this, along with the preparation of court pleadings, to occur in seventeen days.

provided ineffective assistance in state habeas; (2) treating Mr. Johnson differently from other clients with whom he developed a *Martinez/Trevino*-based conflict and for whom he had sought the appointment of conflict-free counsel because it was "his ethical duty" to do so; (3) opposing Mr. Johnson's *pro se* request for conflict free counsel in the district court; and (4) filing a state successor application without informing Mr. Johnson or obtaining his consent to do so, even after he was placed on notice that doing so would erect significant obstacles to the presentation of other newly available claims in state. Ex. 6.

Robert P. Schuwerk, a leader in the field of attorney ethics, reviewed Mr. McCann's actions in this case and found that "conflicts did arise, that they were clear and serious, that Mr. McCann did not address them in a professionally appropriate manner and that, unless remedied by this Court, those missteps by Mr. McCann will cause irreparable injury to Mr. Johnson." Doc. 95 at 9. The conflicted and otherwise inadequate representation that Mr. Johnson received during his initial federal habeas proceeding rendered his *Atkins* claim functionally unavailable.

Previous unavailability is a fact-intensive question appropriate for resolution in the district court; yet, Mr. Johnson meets his prima facie burden at this stage.

### D. Mr. Johnson can make a showing of diligence and innocence under 28 U.S.C. § 2244(b)(2)(B).

Mr. Johnson also requests authorization pursuant to 28 U.S.C. § 2244(b)(2)(B). Under this subsection, a petitioner must show that,

> (B)(i) the factual predicate for the claim could not have been discovered previously through the exercise of due diligence; and
>
> (ii) the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

*Id.* For the reasons stated in Section IV(C), *supra*, the factual predicate for the *Atkins* claim—that Mr. Johnson is intellectually disabled—could not have been discovered previously through the exercise of due diligence, as it hinges on the publication of the DSM-5 in 2013. *See* 28 U.S.C. § 2244(b)(2)(B)(i). And, for the same reasons outlined in Section IV(B), *supra*, Mr. Johnson is able to establish that he is intellectually disabled by clear and convincing evidence, and therefore is actually innocent of

the death penalty. As such, Mr. Johnson satisfies his burden under § 2244(b)(2)(B)(ii) as well.

Mr. Johnson is aware that the Fifth Circuit's precedent appears to foreclose an argument that a claim based on actual innocence of the death penalty can satisfy 28 U.S.C. § 2244(b)(2)(B)(ii). *See In re Webster*, 605 F.3d 256, 257–59 (5th Cir. 2010) (holding that 28 U.S.C. § 2255(h)(1) does not allow challenges relating to the sentence); *see also Turner v. Epps*, 460 F. App'x 322, 330 (5th Cir. 2012) (holding that the logic of *In re Webster* applies to 28 U.S.C. § 2244(b)(2)(B)(ii) because of the similarity in language between the statutes). However, subsequent Supreme Court developments have undercut the rationale in reaching that conclusion. *In re Webster*'s holding relied upon the court's belief that the miscarriage of justice exception in *Sawyer v. Whitley*, 505 U.S. 333 (1992) did not survive the passage of AEDPA. *In re Webster*, 605 F.3d at 258. Subsequently, the Supreme Court has held that the miscarriage of justice exception has, in fact, survived the passage of AEDPA. *McQuiggin v. Perkins*, 569 U.S. 383, 393 (2013).

Mr. Johnson is not aware of any cases in which the Fifth Circuit has addressed the impact of *McQuiggin* on its holding *In re Webster*, and

requests that this Court revisit this question on that basis. In *McQuiggin*, the Supreme Court explained that "[w]e have applied the miscarriage of justice exception to overcome various procedural defaults," including, *inter alia*, "'successive' petitions asserting previously rejected claims" and "'abusive petitions asserting in a second petition claims that could have been raised in a first petition." 569 U.S. at 392–93 (citations omitted). This language provides direct support for the proposition that the miscarriage of justice exception should be available to petitioners to excuse *any* potential procedural bar, including a petitioner such as Mr. Johnson invoking actual innocence of the death penalty to proceed under 28 U.S.C. § 2244(b)(2)(B)(ii).

## IV.   Conclusion and prayer for relief.

For these reasons, Mr. Johnson requests that this Court enter an order that he is intellectually disabled an exempt from execution pursuant to *Atkins* and the Eighth and Fourteenth Amendments to the constitution.

DATED: August \_\_\_, 2019

Respectfully submitted,

JASON D. HAWKINS
Federal Public Defender
Northern District of Texas

_____
Jeremy Schepers
Supervisor, Capital Habeas Unit

_____
Jessica Graf (TX 24080615)
Assistant Federal Defender
Office of Federal Public Defender
Northern District of Texas
525 S. Griffin St., Ste. 629
Dallas, TX 75202
214-767-2746
214-767-2886 (fax)
Jeremy_Schepers@fd.org
Jessica_Graf@fd.org