United States District Court
Southern District of Texas
**ENTERED**
October 28, 2022
Nathan Ochsner, Clerk

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| DEXTER JOHNSON, | § | |
| | § | |
| Petitioner, | § | |
| VS. | § | CIVIL ACTION NO. 4:19-CV-3047 |
| | § | |
| BOBBY LUMPKIN, | § | |
| | § | |
| Respondent. | § | |

## <u>MEMORAMDUM AND ORDER</u>

The Court of Appeals for the Fifth Circuit has authorized Dexter Johnson, an inmate on Texas' death row, to file a successive federal habeas corpus petition. Johnson wants to litigate a single issue: whether he is intellectually disabled and thus exempt from execution under *Atkins v. Virginia*, 536 U.S. 304 (2002). The strict limitations on federal review contained in the Anti-Terrorism and Effective Death Penalty Act pose a barrier to federal consideration of Johnson's successive petition. This Court must determine under AEDPA's rigorous standards whether it may consider Johnson's successive petition.

This Court held an evidentiary hearing in March 2022. The parties have submitted significant post-hearing briefing. The Court must now decide (1) whether Johnson has complied with AEDPA's successive-petition requirements and (2) whether Johnson has sought federal relief in a timely manner. For the reasons discussed below, the Court finds that successive proceedings are appropriate in this case.

## I.    BACKGROUND

Johnson murdered 23-year-old Maria "Sally" Aparece during a robbery on June 18, 2006. The Court has already provided a lengthy factual recitation of Johnson's crime. The Court will incorporate that background by reference. (Docket Entry No. 18 at 1-13); *see also Johnson v.*

*Stephens*, 617 F. App'x 293 (5th Cir. 2015); *Johnson v. Stephens*, 4:11-cv 2466, Docket Entry No. 84 at 1-4; *Johnson v. State*, 2010 WL 359018, at *1 (Tex. Crim. App. 2010).

### A.    Intellectual Disability and the Law

Well before Johnson's trial, the Supreme Court decided that the Eighth Amendment's "evolving standards of decency" meant that "death is not a suitable punishment for [an intellectually disabled] criminal." *Atkins*, 536 U.S. at 321.[1]  The Supreme Court, however, "did not provide definitive procedural or substantive guides for determining when a person who claims [intellectual disability] will be so impaired as to fall within *Atkins'* compass." *Bobby v. Bies*, 556 U.S. 825, 831 (2009) (quotation omitted); *see also Moore v. Quarterman*, 454 F.3d 484, 493 (5th Cir. 2006) ("[T]he *Atkins* Court did not adopt a particular criteria for determining whether a defendant is mentally retarded[.]").   Courts and legislatures came to apply the framework established by professional psychological organizations.  An inmate must make three showings before being entitled to a diagnosis of intellectual disability: (1) significantly subaverage intellectual functioning, manifested by an IQ of about 70 or below; (2) related significant limitations in adaptive skill areas; and (3) manifestation of those limitations before age 18.  *See Clark v. Quarterman*, 457 F.3d 441, 446 (5th Cir. 2006).  How courts applied those diagnostic criteria have set the course for the matters now at issue.

Many of the issues in this case stem from a judicial gloss that the Texas court placed over the *Atkins* inquiry between 2004 and 2017.  The Texas Court of Criminal Appeals crafted "seven evidentiary factors" which became known as the "*Briseno* factors" to aid in deciding whether an inmate had adaptive deficits.  *Ex parte Briseno*, 135 S.W.3d 1 (Tex. Crim. App. 2004).  These

---

[1]        "Intellectual disability" is the diagnostic term now used for what used to be called mental retardation. *See Hall v. Florida*, 572 U.S. 701, 704 (2014).

factors did not rely on any professional psychological paradigm, but on "lay perceptions of intellectual disability." *Moore v. Texas*, 137 S. Ct. 1039, 1051 (2017) (*Moore I*). The seven factors which "factfinders could focus upon . . . in weighing evidence as indicative of intellectual disability" were:

1.     Did those who knew the person best during the developmental stage—his family, friends, teachers, employers, authorities—think he was intellectually disabled at that time, and, if so, act in accordance with that determination?

2.     Has the person formulated plans and carried them through or is his conduct impulsive?

3.     Does his conduct show leadership or does it show that he is led around by others?

4.     Is his conduct in response to external stimuli rational and appropriate, regardless of whether it is socially acceptable?

5.     Does he respond coherently, rationally, and on point to oral or written questions or do his responses wander from subject to subject?

6.     Can the person hide facts or lie effectively in his own or others' interests?

7.     Putting aside any heinousness or gruesomeness surrounding the capital offense, did the commission of that offense require forethought, planning, and complex execution of purpose?

*Brownlow v. State*, 2020 WL 718026, at *10 (Tex. Crim. App. 2020) (relying on *Briseno*, 135 S.W.3d at 8-9). Texas courts generally applied these "stereotypes of the intellectually disabled" to limit the scope of *Atkins* relief. *Moore I*, 137 S. Ct. at 1052.

## B.     Trial Testimony

Even though Johnson did not qualify for a diagnosis of intellectual disability under the professional standards at place during trial, psychological testimony played an important part in the penalty phase. The defense relied on a mental-health expert, Dr. Dale R. Watson, to present evidence of Johnson's low intelligence. Dr. Watson's testing indicated that Johnson had a low

level of intellectual functioning, around the equivalent of a ten-year-old. Tr. Vol. 31 at 167, 171-72.[2] Johnson's expert considered him to be in the borderline range for intellectual disability. Tr. Vol. 31 at 178, 205. Because his IQ was higher that the cutoff in place at that time for a diagnosis of intellectual disability, Johnson's expert did not assess whether he suffered from adaptive deficits. Tr. Vol. 31 at 263. Trial testimony, therefore, established that Johnson did not meet the diagnostic criteria for *Atkins*' first prong, but did not provide extensive insight about the other prongs.

On June 28, 2007, Johnson was sentenced to death. That same day, the trial court appointed Patrick F. McCann to represent Johnson in state habeas corpus proceedings. Mr. McCann is an experienced capital attorney, having practiced criminal law for over twenty-five years in trial, appellate, and post-conviction cases. (Docket Entry No. 60 at 98-104). Mr. McCann brought with him deep knowledge and experience in dealing with mental-health issues. (Docket Entry No. 60 at 106-07). Mr. McCann's representation has become a core concern in deciding whether Johnson can litigate an *Atkins* claim.

Johnson did not raise any claim relating to intellectual disability on direct appeal or state habeas review. On June 28, 2011, Mr. McCann filed a federal petition on Johnson's behalf. *Johnson v. Stephens*, 4:11-cv-2466, Docket Entry No. 1.[3] Johnson's federal petition did not raise any issue relating to his intellectual functioning.

---

[2]     Dr. Watson assessed Johnson's IQ through two tests: the Stanford Binet Intelligence Scale, Fifth edition, and the Wechsler Adult Intelligence Scale, Third edition (WAIS-III).  31 RR 196.  Applying a standard error of measurement and a principle called the Flynn Effect, Dr. Watson opined that Johnson's IQ was somewhere between 74 and 88.  31 RR 204.  Dr. Watson testified that Johnson did not have obvious deficits in adaptive behavior. 31 RR 206.  Dr. Watson testified that Johnson was not intellectually disabled.  31 RR 20.

[3]     The Honorable United States District Judge Gray H. Miller presided over Johnson's initial habeas action.

C.      **Developments in *Atkins* Jurisprudence**

Changes in how both the courts and the mental-health profession view intellectual disability have shaped the extent to which Johnson's low intelligence has mattered. Revised psychological standards governing intellectual disability would eventually enhance Johnson's ability to raise a successful *Atkins* claim. On May 18, 2013, the American Psychological Association revised its diagnostic manual, the Diagnostic and Statistical Manual of Mental Disorders (DSM-V). The DSM-V significantly altered how clinicians viewed the relationship between IQ scores and intellectual disability. The DSM-V "recogniz[ed] that an individual with an IQ score over 70 may still qualify as intellectually disabled." *In re Milam*, 838 F. App'x 796, 799 (5th Cir. 2020). Thus, "[t]he latest DSM-5 manual changed the diagnostic framework for intellectual disability. Higher IQ scores no longer bar a diagnosis of an intellectual disability." *In re Johnson*, 935 F.3d 284, 292 (5th Cir. 2019).

Shortly after its publication, the Supreme Court addressed the DSM-V in *Hall v. Florida*, 572 U.S. 701 (2014). *Hall* explicitly held that the *Atkins* determination must be "informed by the medical community's diagnostic framework." 572 U.S. at 721. In *Hall*, the Supreme Court relied on the DSM-V to recognize that, while not "unhelpful," IQ scores are not the only consideration in an *Atkins* inquiry. *Id.* at 723. The DSM-V repudiated previous over-reliance on IQ test scores. *See id.* at 721-22. Simply put, the Supreme Court followed the mental-health profession in recognizing that "intellectual disability is a condition, not a number." *Id.* In subsequent cases, the Supreme Court would continue to emphasize the importance of relying on current standards developed by professional mental-health organizations. *See Brumfield v. Cain*, 576 U.S. 305, 308 (2015).

The Supreme Court's reliance on the DSM-V did not initially change Texas' use of the *Briseno* factors. As the Supreme Court brought *Atkins* jurisprudence in sync with the medical community, the Texas courts continued to apply the judge-made *Briseno* factors. *See Ex Parte Moore*, 470 S.W.3d 481, 486 (Tex. Crim. App. 2015) (refusing to adopt a recommendation that habeas relief be granted when the lower court relied on the DSM-V); *Ex parte Cathey*, 451 S.W.3d 1, 10 (Tex. Crim. App. 2014) (mentioning, but not relying on, the DSM-V standards). Finally in 2017, Texas' approach to *Atkins* cases came to a head when the Supreme Court threw out the *Briseno* standards in *Moore I*.

On remand in *Moore I* in 2018, the Court of Criminal Appeals finally "conclude[d] that the DSM-5 should control [its] approach to resolving the issue of intellectual disability." *Ex parte Moore*, 548 S.W.3d 552, 560 (Tex. Crim. App. 2018). Even then, the Court of Criminal Appeals supplanted its *Briseno* factors with additional non-psychological factors. The Supreme Court subsequently had to rectify Texas' failure to adhere closely enough to the psychological profession's standards. *See Moore v. Texas*, ___ U.S. ___, 139 S. Ct. 666 (2019) (*Moore II*).

### D.      The Response to the DSM-V by Mr. McCann and Johnson's Current Attorneys

When the DSM-V issued, Johnson's federal petition was still pending.[4] Mr. McCann knew about the DSM-V and knew it could change the way mental-health professionals evaluated Johnson. While developments in the law and in psychology which would favor Johnson were occurring, Mr. McCann did not have Johnson reevaluated under the DSM-V standards or otherwise investigate the possibility of raising an *Atkins* claim.

---

[4]      On August 19, 2013, the Court denied Johnson's initial federal petition. *Johnson v. Stephens*, 4:11-cv-2466, Docket Entry No. 19.

Mr. McCann only began an investigation into *Atkins* relief after the State of Texas set Johnson's execution for May 2, 2019. Mr. McCann filed a successive state habeas application raising an *Atkins* claim as Johnson's execution date approached. *Ex parte Johnson*, 2019 WL 1915204 (Tex. Crim. App. 2019). Mr. McCann also filed a federal motion to proceed *ex parte* in a request for funds to develop an *Atkins* claim. *Johnson v. Stephens*, 4:11-cv-2466, Docket Entry No. 75. Mr. McCann based these filings on a psychological evaluation performed by Dr. Greg Hupp less than a month before Johnson's execution date. Using the DSM-V standard, Dr. Hupp diagnosed Johnson with intellectual disability.

New attorneys eventually began representing Johnson in federal court. Johnson's new attorneys arranged for an evaluation by another expert, Dr. Daniel A. Martell. Dr. Martell confirmed the diagnosis of intellectual disability. Johnson's new attorneys brought an *Atkins* claim before the Fifth Circuit. The Fifth Circuit stayed Johnson's execution. The Fifth Circuit also authorized Johnson to file a successive federal petition.

On August 15, 2019, Johnson filed his successive habeas petition in this Court. (Docket Entry No. 1). Johnson amended his successive petition on November 12, 2019 (Docket Entry No. 8) and moved for an evidentiary hearing, (Docket Entry No. 9). Johnson supports his successive habeas petition with the following evidence indicating that he may be entitled to *Atkins* relief:

· An affidavit from Dr. Greg Hupp. On April 4, 2019, Dr. Hupp administered a WAIS-IV IQ test which resulted in an IQ of 70. Dr. Hupp also assessed lay testimony and the results of testing to decide that Johnson suffers from adaptive deficits. With that testing, Dr. Hupp concluded that Johnson "meets the DSM-5 criteria as a person with an **intellectual disability, mild**." (Docket Entry No. 1, Exhibit 2) (emphasis added).

· A forensic neuropsychological report by Dr. Daniel A. Martell. Dr. Martell found that Johnson qualified for a diagnosis of intellectual disability. In particular, Dr. Martell opined that Johnson suffered mild to moderate impairments in his adaptive deficits. (Docket Entry No. 1, Exhibit 1). Dr.

7

Martell avers that it "is it clear that Dexter Johnson meets the criteria for a diagnosis of Intellectual Disability." (Docket Entry No. 1, Exhibit 1).

· An affidavit from Dr. Dale G. Watson, the defense expert at trial. Dr. Watson states that his test results at the time of trial "would not automatically preclude a diagnosis of Intellectual Disability" under the DSM-V standards. (Docket Entry No. 1, Exhibit 3).

· Declarations from family members and others to show adaptive deficits. (Docket Entry No. 1, Exhibit 3).

Taken together, Johnson's argument and evidence provide the basis for a viable *Atkins* claim.

## II.   The Evidentiary Hearing and Subsequent Briefing

The Court held an evidentiary hearing on March 31, 2022. (Docket Entry No. 60).[5] The hearing had two discrete purposes: "(1) decide whether Johnson is entitled to proceed with his successive petition and (2) examine the timeliness of Johnson's successive petition." (Docket Entry No. 18 at 1). Only Mr. McCann testified at the hearing. The Court, however, received substantial evidence from the parties, including depositions from other attorneys who had represented Johnson. The parties have each filed post-hearing briefing. (Docket Entry No. 63, 64).

Respondent's post-hearing briefing approaches the evidentiary hearing testimony with a focus on the decisions Mr. McCann made. Respondent urges that "[t]he only unanswered question of the Court at this point is whether an *Atkins* claim was functionally unavailable Johnson during the pendency of his initial federal habeas proceedings because McCann was ineffective." (Docket

---

[5]   The Supreme Court recently explained that, under section 2254(e)(2), a court improperly holds an evidentiary hearing or considers new evidence to determine whether cause and prejudice exist to overcome procedural default "if the newly developed evidence never would 'entitle the prisoner to federal habeas relief.'" *Shinn v. Ramirez*, —— U.S. ——, 142 S Ct. 1718, 1739 (2022). Respondent has not pointed to any authority extending *Ramirez* to the reasons for which this Court held a limited evidentiary hearing.

Entry No. 64 at 20).[6]  Respondent urges the Court to find that Mr. McCann weighed the possibility of raising an *Atkins* claim but felt hobbled by Texas' *Briseno* jurisprudence.  Respondent's arguments ask the Court to defer heavily to strategic decisions made by Mr. McCann.

Johnson's briefing also focuses on Mr. McCann's testimony, but does so by contrasting his representation against developments in psychology, changes in the law, and decisions he made in other cases.  From his hearing testimony, Mr. McCann was clearly aware that the DSM-V's publication breathed life into an otherwise tepid *Atkins* claim.  Mr. McCann was familiar with Texas and federal *Atkins* jurisprudence.  Mr. McCann, however, withheld an *Atkins* claim while other cases challenged Texas' *Briseno* standard.  Johnson argues that Mr. McCann's failure to raise an *Atkins* claim was negligent or incompetent.

The Court must now decide if Johnson's *Atkins* claim was available before he filed it and whether he filed it too late.  The core issues before the Court are simple.  The psychological profession changed its understanding of intellectual disability in a manner which transformed a previously weak *Atkins* claim into a potential exemption from execution.  The Supreme Court soon thereafter made those standards the law of the land.  The testimony in the evidentiary hearing was clear—Mr. McCann knew he could develop a viable *Atkins* claim.  Prognosticating that the state courts would not follow the Supreme Court's direction in *Atkins* jurisprudence, Mr. McCann

---

[6]     Aside from addressing the testimony and evidence from the hearing, Respondent's post-hearing brief spends a significant amount of time taking issue with various legal matters which the Court has previously resolved, both in the first instance and in a motion for rehearing.  For example, Respondent disputes whether equitable exceptions exist to section 2244(d), whether a district court can apply law the circuit court has created in its threshold successiveness review, and whether the Court should apply circuit law which considers some *Atkins* claims previously unavailable until the publication date of the DSM-V.  (Docket Entry No. 64 at 8-14, 19).  To the extent Respondent disagrees with earlier legal decisions, an appeal is the proper vehicle for challenging decisions already made by the Court (and in some instances, reconfirmed on reconsideration).  This Court's concern is whether the evidence in the hearing will allow Johnson's petition to proceed toward adjudication.

withheld raising it. The question is whether Johnson may now litigate his *Atkins* claim under AEDPA's successive petition standards.

## III.   Successive Federal Review

In 2019, Johnson moved in the Fifth Circuit for leave to file a successive federal habeas petition. AEDPA imposes restrictions on a prisoner's ability to file a second or successive habeas petition. *See* 28 U.S.C. § 2244. An inmate must first receive permission from a circuit court before a district court may consider successive habeas claims.

Johnson's pleadings in the Fifth Circuit relied on section 2244(b)(2)(A) which required three showings: (1) the claim was not presented in a prior petition; (2) the inmate relied on a new rule of constitutional law that the Supreme Court had made retroactive; and (3) he made a prima facie showing that his claim had merit. Respondent conceded that Johnson had not presented his *Atkins* claim in a previous petition. *See In re Johnson*, 935 F.3d 284, 292 (5th Cir. 2019). Relying on *In re Cathey*, 857 F.3d 221 (2017), the Fifth Circuit found that the DSM-V's "significant change . . . in the medical methodology for evaluating the relevant disabilities and . . . courts' recognition of those changes" made Johnson's *Atkins* claim previously unavailable to him. *Johnson*, 935 F.3d at 292-93.[7] Primarily based on Dr. Martell's report, the Fifth Circuit found that Johnson made a

---

[7]     Respondent continues to advance a theory that law created in a circuit court's review under 28 U.S.C. § 2244(b)(3)(c)—which Respondent terms the "authorization context" (Docket Entry No. 64 at 16 n.10)—does not apply to the district courts. Respondent faults this Court for following law created in "the Fifth Circuit's nonappealable determinations in the prima facie context." (Docket Entry No. 64 at 8). Respondent has not supported this theory with any precedent. True, federal law requires the district court to consider *de novo* the facts and the application of those facts to the law. Respondent, however, does not cite any precedent which gives district courts authority to write their own law independent of the Fifth Circuit jurisprudence in section 2244(b) cases. Respondent has not provided any reason for this Court to ignore the Fifth Circuit's interpretation of the law, regardless of whether it was created in the "authorization context" or after plenary habeas review.

prima facie showing that his claim has merit. *Johnson*, 935 F.3d at 294. The Fifth Circuit authorized Johnson's petition to proceed and stayed Johnson's execution.

Johnson then filed an amended petition in this Court. (Docket Entry No. 8). The Fifth Circuit's authorization of successive proceedings "is tentative" and this Court "must dismiss" Johnson's successive petition "without reaching the merits, if the court finds that the movant has not satisfied the § 2244(b)(2) requirements." *In re Swearingen*, 556 F.3d 344, 349 (5th Cir. 2009).

This Court must determine if the pending petition conclusively meets AEDPA's second or successive petition requirements. Johnson may only proceed on his federal petition if he relies on (1) a new rule that (2) the Supreme Court has made retroactive and which (3) was not previously available to him. *See Tyler v. Cain*, 533 U.S. 656, 662 (2001).

## A.    A New, Retroactive Rule

Successive federal habeas proceedings in this instance depend on Johnson meeting AEDPA's requirement that he rely on "a new rule of constitutional law, made retroactive . . . ." 28 U.S.C. § 2244(b)(2)(A). Respondent's briefing muddies this Court's inquiry by characterizing Johnson's argument to be that the DSM-V, or possibly its application in later cases, created a new rule of constitutional law. (Docket Entry No. 64 at 12-14, 18). In essence, Respondent characterizes Johnson's argument as "rely[ing] on the DSM-V as the operative 'new rule of constitutional law' [that] giv[es] rise to his *Atkins* claim." (Docket Entry No. 64 at 12).[8]

---

[8]    Respondent argues that "Johnson either relies on an old rule that was made retroactive—*Atkins*—and was thus previously available or he relies on new rules [in the *Moore* cases] that have never been made retroactive by the Supreme Court[.]" (Docket Entry No. 64 at 20). "*Atkins* in a generic sense [is] a rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court . . . ." *In re Johnson*, 935 F.3d 284, 293 (5th Cir. 2019). However, a "new rule" generally is one that was "not dictated by precedent existing at the time the defendant's conviction became final." *Gilmore v. Taylor*, 508 U.S. 333, 340 (1993); *see also* Brian R. Means, Federal Habeas Manual, § 27:6 (2021 Edition). Respondent argues that successive proceedings would be inappropriate because *Atkins* was not "new" in this context because it arose before Johnson's conviction.

Johnson, however, never argues that the DSM-V itself amounts to a new rule of constitutional law. Johnson clearly argues that "'*Atkins* created a new rule of constitutional law . . . made retroactive to cases on collateral review by the Supreme Court.'" (Docket Entry No. 63 at 8) (quoting *In re Campbell*, 750 F.3d 523, 530 (5th Cir. 2014)).

*Atkins* unquestionably created a new rule of constitutional law. *See In re Soliz*, 938 F.3d 200, 203 (5th Cir. 2019); *Johnson*, 935 F.3d at 292; *Cathey*, 857 F.3d at 228. *Atkins* was made retroactive on federal habeas review. *See Bell v. Cockrell*, 310 F.3d 330, 332 (5th Cir. 2002). While *Atkins* is generally considered retroactive, the question in this case is whether *Atkins* should be retroactive *as to Johnson*. For reasons similar to those discussed herein under the "previously unavailable" inquiry, the circumstances are such that the DSM-V "removed a clear barrier to [Johnson's] claim, making *Atkins* available to him for the first time." *Soliz*, 938 F.3d at 203; *see also Cathey*, 857 F.3d at 228. Under Fifth Circuit law, Johnson has met AEDPA's requirement that he relies on a new rule that the Supreme Court has made retroactive.

## B.     Previously Unavailable

Johnson must show that *Atkins* was "previously unavailable" to him. 28 U.S.C. § 2244(b)(2)(A). AEDPA itself does not define that phrase. The phrase contains two components: a question of timing (simply put, previous to what?) and a question of accessibility (in other words, what does it mean to be unavailable?). Considering both those factors, Johnson has shown that he could not have raised an *Atkins* claim during his initial habeas proceedings.

### 1.     Previously/Futility

AEDPA itself does not set out when a claim could have been raised "previously."[9] Soon after AEDPA's enactment, courts generally agreed that the term focuses on when "the first federal

---

[9]     AEDPA uses the same phrase when allowing a federal evidentiary hearing if the petitioner failed to develop the factual basis of his claim in state court so long as the petitioner's claim relies on "a new rule of constitutional law,

habeas application was filed." *In re Medina*, 109 F.3d 1556, 1566 (11th Cir. 1997); *see also Mathis v. Thaler*, 616 F.3d 461, 467 (5th Cir. 2010) ("The issue before us is whether Mathis has demonstrated that his *Atkins* claim was "previously unavailable" at the time he filed his first federal habeas application."); *Rodriguez v. Superintendent, Bay State Correctional Center*, 139 F.3d 270, 274 (1st Cir. 1998) ("The time frame of the applicant's previous habeas petition provides the coign of vantage from which we assess whether a rule of constitutional law was 'previously unavailable.'"). *Atkins* was the law of the land, and technically available as a ground for relief to petitioners, when Johnson filed his federal petition in 2011. Under a strict reading of section 2244(b), any inmate who filed a federal petition after 2002 would have to include an *Atkins* claim in his initial petition or forever forfeit his right to bring the claim.

Johnson argues that, despite the theoretical existence of *Atkins* as a ground for relief, it only became a viable claim after the DSM-V's publication in 2013. (Docket Entry No. 63 at 8). Johnson's argument comports with Fifth Circuit law. The Fifth Circuit eschews a "strict rule" regarding when a claim was available to an inmate and recognizes "a gray area of previous unavailability [of a new constitutional rule] despite technical availability." *Cathey*, 857 F.3d at 229-30. In other words, the Fifth Circuit has read a *futility* exception into section 2244(b)(2)(A).[10] This exception includes a "rebuttable presumption that a new rule of constitutional law was previously available if published by the time a district court ruled on a petitioner's initial habeas

---

made retroactive to cases on collateral review by the United States Supreme Court, that was previously unavailable." 28 U.S.C. § 2254(e)(2)(A)(i). The courts have not provided a definition of that phrase beyond the text of the statute. *See* Brian R. Means, Postconviction Remedies § 22:8 (June 2021 update) ("The statute does not indicate what the establishment of the new, retroactively-made rule must be 'previous' to."). AEDPA also uses the phrase in the comparable provision for federal prisoners. *See* 28 U.S.C. § 2255(h).

[10]     Respondent argues that "there is no futility exception in § 2244(b)(2)(A)," but does not explain away the Fifth Circuit cases which have recognized that judicially created exception other than to say that they do not apply to a district court. (Docket Entry No. 64 at 13).

petition," which can be overcome by presenting "cogent arguments that [the claim] was previously unavailable" during the initial habeas proceedings. *Cathey*, 857 F.3d at 229; *see also Muñoz v. United States*, 28 F.4th 973, 977 (9th Cir. 2022) ("Under this approach, the prisoner seeking to file a second or successive request for habeas relief must show that the real-world circumstances that he faced prevented him, as a practical matter, from asserting his claim based on a new rule of law in his initial habeas proceeding.").

Thus, when circumstances arise—such as changes in the methodology for assessing intellectual disability under DSM-V—which remove a clear barrier to raising a claim, the Fifth Circuit asks when a new rule has functionally been made "available to [the inmate] for the first time." *Soliz*, 938 F.3d at 203 (describing the Fifth Circuit's action in *Johnson*); *see also Milam*, 838 F. App'x at 799 (citing *Johnson*, 935 F.3d at 293). In the specific context of *Atkins* cases, the Fifth Circuit has recognized that both the "significant changes in medical methodology for evaluating relevant disabilities" and the "courts' recognition of those changes" may make a claim available for the first time. *Milam*, 838 F. App'x at 799 (quoting *Johnson*, 935 F.3d at 294); *see also In re Halprin*, 788 F. App'x 941, 944 (5th Cir. 2019).

Applying a futility exception in its preliminary review under section 2244(b), the Fifth Circuit recognized that the *Atkins* claim "had previously been unavailable because under earlier medical understandings of intellectual disability relevant to Johnson's condition" and thus any "*Atkins* claim would have been futile." *Soliz*, 938 F.3d at 203 (relying on *Johnson*). This Court agrees that, because earlier psychological standards made *Atkins* relief inapplicable to Johnson, raising an *Atkins* claim would have been futile until the DSM-V issued.[11] The Court, therefore,

---

[11] While arguing that no "futility exception to the successiveness-bar exist[s]," Respondent says that "raising an *Atkins* claim on Johnson's behalf would have been entirely futile until at least *Moore I*." (Docket Entry No. 64 at 17).

finds that Johnson could not have raised his claim previously; that is, he could not have raised it when he filed his federal petition.

2.     Unavailability/Feasibility

The futility of raising an *Atkins* claim ended for Johnson when the DSM-V was published on May 18, 2013. Johnson was then still litigating his first federal habeas petition. The evidentiary hearing testimony established that Mr. McCann was aware that the DSM-V was published and that it would make a difference to Johnson. Mr. McCann, however, did not file any *Atkins* claim on Johnson's behalf between that point and when a final judgment issued months later. Johnson's case requires considering whether a claim can still be unavailable when it comes into existence midstream in the federal habeas process.

AEDPA itself does not spell out when a claim has been "unavailable." The Fifth Circuit reads into the "previously unavailable" phrase a functional concern for when it was "'feasible to amend [the inmate's] pending petition to include the new claim.'" *In re Wood*, 648 F. App'x 388, 391 (5th Cir. 2016) (quoting *In re Everett*, 797 F.3d 1282, 1288 (11th Cir. 2015)); *see also Cathey*, 857 F.3d at 233.[12] The Court must decide whether it would have been *feasible* for Johnson to litigate an *Atkins* claim during his on-going federal action.

As a general rule, federal habeas practice does not sanction adding new claims late in the adjudicative process. The habeas rules encourage inmates to "specify all [available] grounds for relief" in their original habeas petition and to "state the facts supporting each ground." Rule 2(c) of the Rules Governing Section 2254 Cases in the United States District Courts. A habeas petition "may be amended . . . as provided in the rules of procedure applicable to civil actions." 28 U.S.C.

---

[12]    Other circuits have also rejected a "mechanistic test" when assessing previous unavailability. *In re Hill*, 113 F.3d 181, 183 (11th Cir. 1997); *see also Muñoz v. United States*, 28 F.4th 973, 977 (9th Cir. 2022); *Davis v. Norris*, 423 F.3d 868, 879 (8th Cir. 2005).

§ 2242.  Federal Rule of Civil Procedure 15 provides that "leave to amend shall be freely given

when justice so requires."  Under the applicable federal rules, "pleadings may be amended once

as a 'matter of course,' i.e., without seeking court leave" before "a responsive pleading is served[.]"

*Mayle v. Felix*, 545 U.S. 644, 655 (2005) (citing Fed. Rule Civ. Proc. 15(a)).  After that point,

leave to amend is by no means automatic and a district court has discretion whether to allow

amendment.  *Addington v. Farmer's Elevator Mut. Ins. Co.*, 650 F.2d 663, 666 (5th Cir. 1981).

     A federal court will consider various factors in deciding whether to permit amendment in

a case such as this one, both after Respondent files an answer and occurring late in the adjudicative

process.  A court may disallow amendment for various reasons including "undue delay, bad faith

or dilatory motive on the part of the movant, repeated failures to cure deficiencies by amendments

previously allowed, undue prejudice to the opposing party by virtue of allowance of the

amendment, [or] futility of amendment."  *Foman v. Davis*, 371 U.S. 178, 182 (1962).[13]

     When the DSM-V issued, the parties were still briefing a motion Johnson had filed to

amend his petition on other grounds.  *Johnson v. Stephens*, 4:11-cv-2466, Docket Entry No. 14.

That attempted amendment came late in the habeas process—"almost two years after Mr. Johnson

filed his initial federal habeas petition, nearly fifteen months after the State filed its answer, and

nearly ten months after Mr. Johnson replied." (Docket Entry No. 63 at 18-19).  Three months later

the Court entered a Memorandum and Order denying habeas relief on all but one claim.  *Johnson*

*v. Stephens*, 4:11-cv-2466, Docket Entry No. 19.  The Court also denied Johnson's request to

amend his petition.  The Court gave several reasons for denying amendment.  Amendment at that

---

[13]    Habeas amendments raising claims involving the same "conduct, transaction, or occurrence set forth or
attempted to be set forth in the original pleading" will "relate back to the date of the original pleading." *Mayle v.
Felix*, 545 U.S. 644, 656 (2005).  Without the "common core of operative facts," however, a court may be discouraged
from allowing amendment.  *Id.* at 664.

late stage "would needlessly insert delay into the habeas process," "high procedural obstructions" including exhaustion existed to "federal habeas review and relief," and Johnson's proposed claims were inadequately developed. *Johnson v. Stephens*, 4:11-cv-2466, Docket Entry No. 19 at 14-15.

Those same problems would have doomed any effort to add an *Atkins* claim. Johnson had not exhausted any *Atkins* issue. An *Atkins* claim requires serious consideration of numerous factual issues. Federal habeas practice has long given the state courts the right to adjudicate claims in the first instance. It would have run contrary to AEDPA's stated concern for efficiency to pause federal review, possibly for years, when the other claims in Johnson's petition were ripe for adjudication.

Johnson could not have amended his petition to include a claim based on *Atkins*. Given the totality of the circumstances in this case, and particularly how late in the proceedings in which an *Atkins* claim based on the DSM-V arose, the Court finds that it would not have been feasible for Johnson to try amending his petition. Thus, the Court finds that Johnson has shown that his *Atkins* claim was unavailable.

### 3.    Deficient Representation Exception to Section 2244

In addition to its interpretation of the phrase "previously unavailable," the Fifth Circuit has recognized that an extra-statutory exception to the AEDPA language may exist when a petitioner's "representation in the initial federal habeas proceedings was so deficient as to render the *Atkins* claim functionally unavailable." *Wood*, 648 F. App'x at 392. Johnson argues that Mr. McCann's representation made his *Atkins* claim "functionally unavailable" to him. (Docket Entry No. 16 at 8). With the Court's decision above, it is not necessary to consider Mr. McCann's representation in the section 2244(b)(2) inquiry. If it would have been futile to raise an *Atkins* claim before the DSM-V came out, and it was not feasible to add it to the on-going proceedings, then concerns

about Mr. McCann's representation dissipate in the section 2244(b)(2) review.   The Court

observes, however, that the discussion that follows below concerning AEDPA's limitation period

applies with full force to Mr. McCann's representation immediately after the DSM-V issued.

### C.      Conclusion of Successiveness Review

Under AEDPA's second-gatekeeper review, the Court finds that the Johnson relies on a

new, retroactive rule that was previously unavailable to him.   The Court, therefore, can adjudicate

Johnson's successive petition.

## IV.      Limitations Period

The question of timeliness is separate from the authorization of successive proceedings.

Section 2244(d) created a strict timetable which inmates must comply with when filing for federal

habeas relief.   The relevant subsections create a series of trigger dates from which an inmate has a

year to file his federal petition.   28 U.S.C. § 2244(d)(1).

Johnson filed his *Atkins* claim on August 15, 2019, several years after the DSM-V issued.

Under any scenario,[14] he filed his federal petition late.   Strict application of AEDPA's statutory

language would bar federal consideration of his *Atkins* claim.

### A.      Equitable Tolling Standard

In recognition of AEDPA's harsh consequences, the Supreme Court has held that equitable

tolling may forgive noncompliance with the timeliness provision.   *See Holland v. Florida*, 560

U.S. 631, 634 (2010).   "To establish his entitlement to equitable tolling, a petitioner must 'sho[w]

(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstances

stood in his way and prevented timely filing.'"   *Manning v. Epps*, 688 F.3d 177, 183 (5th Cir.

---

[14]      The Fifth Circuit has not yet decided whether to measure an inmate's compliance with the limitations period
from the publication of the DMS-V or from *Moore I*.   *See In re Jones*, 998 F.3d 187, 190 (5th Cir. 2021); *Milam*, 838
F. App'x at 798; *Sparks*, 939 F.3d at 632.

2012) (quoting *Holland*, 560 U.S. at 649). Johnson asks this Court to find equitable tolling under one of three theories: (1) actual innocence, (2) abandonment, or (3) ineffective representation.

### B.     Actual Innocence of the Death Penalty

Johnson argues that "[t]his Court may exercise [the] equitable exception to the statute of limitations because Mr. Johnson's intellectual disability renders him innocent of the death penalty." (Docket Entry No. 66 at 21). Johnson relies on *McQuiggin v. Perkins*, 569 U.S. 383 (2013), in which the Supreme Court held that a credible showing of actual innocence can overcome the habeas statute of limitations. The briefing, however, is still insufficient to allow equitable tolling on that basis for two reasons.

First, the *McQuiggin* case only approached equitable tolling from the question of an inmate's innocence of the underlying crime. *See McQuiggin*, 569 U.S. at 399 (basing its exception to the limitations period on showing "that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence") (quoting *Schlup v. Delo*, 513 U.S. 298, 327 (1995). Claims of innocence in sentencing invoke far different concerns than the execution of one innocent of the crime. *See Schlup*, 513 U.S. at 324-27 ("Claims of actual innocence pose less of a threat to scarce judicial resources and to principles of finality and comity than do claims that focus solely on the erroneous imposition of the death penalty."). To date, the Fifth Circuit has avoided the question of whether actual innocence of the death penalty may forgive a procedural bar. *See Tamayo v. Stephens*, 740 F.3d 986, 990 (5th Cir. 2014). Johnson has not cited any precedent extending *McQuiggin* to allow equitable tolling for questions involving sentencing.

Second, the record at this point is insufficient to find that Johnson is actually innocent of his death sentence. Even if *McQuiggin* jurisprudence allows for intellectual disability to be make an inmate actually innocent of the death penalty, the evidence before the Court is still insufficient

to find that Johnson warrants protection under *Atkins*. As a prima facie matter, Johnson appears to have a strong *Atkins* claim available to him. But Johnson's evidence has not yet been tested in adversarial proceedings. It would be premature to find Johnson actually innocent of his death sentence before full review of his *Atkins* claim. The Court, therefore, reserves the question of whether actual innocence overcomes the procedural bar until further proceedings shed greater light on his *Atkins* claim.

## C.    Abandonment

Johnson next suggests that the Court should find that Mr. McCann had abandoned him. Johnson alleges that Mr. McCann did not make choices based on any plan, but instead just neglected Johnson's case. Johnson's abandonment argument depends on finding that Mr. McCann was not credible when he explained why he did not advance an *Atkins* claim before 2019.

The Court, however, finds that Mr. McCann was a credible witness whose account was believable. From his testimony, it is apparent that Mr. McCann made choices based on his own assessment of the law and Johnson's own circumstances. Mr. McCann never ceased litigating on Johnson's behalf. He just did not litigate an *Atkins* claim until the eve of an execution date.

## D.    Deficient Representation

Equitable tolling depends on Mr. McCann's representation. Johnson argues that "Mr. McCann's chosen course of litigation was objectively unreasonable to the point that it constituted egregious professional misconduct." (Docket Entry No. 63 at 2). In other words, equitable tolling is warranted because Mr. McCann "claimed to deliberately choose not to raise a claim that would have resulted in relief" for Johnson. (Docket Entry No. 63 at 3).

Among other possible circumstances, the Supreme Court has said that "at least sometimes, professional misconduct . . . could nonetheless amount to egregious behavior and create an

20

extraordinary circumstance that warrants equitable tolling." *Holland*, 560 U.S. at 651.   The Supreme Court has recognized that, while a "garden variety claim of misconduct" by counsel does not warrant equitable tolling, "far more serious instances of attorney conduct may." *Id.* at 651-52; *see also Cousin v. Lensing*, 310 F.3d 843, 849 (5th Cir. 2002) ("[M]ere attorney error or neglect is not an extraordinary circumstance such that equitable tolling is justified.")).   "Tolling based on counsel's failure to satisfy AEDPA's statute of limitations is available only for "'serious instances of attorney misconduct.'"   *Christeson v. Roper*, 574 U.S. 373, 378 (2015) (quoting *Holland*, 560 U.S. at 651-52).   The Court must decide whether Mr. McCann's representation provides a basis for equitable tolling because he withheld claims from federal review and failed to litigate zealously for Johnson, as he had for other inmates.

Mr. McCann's evidentiary hearing testimony demonstrated that he has a rich understanding of *Atkins* law and mental-health issues in capital cases.   The Court was left with little doubt that Mr. McCann had kept abreast of changes in both the psychological understanding of intellectual disability and the legal responses to those changes.   (Docket Entry No. 60 at 51-61).   Mr. McCann used that knowledge to pursue *Atkins* relief in other cases.   For instance, in early 2014 Mr. McCann began litigating an *Atkins* claim based on the DSM-V in behalf of another client, Texas death-row inmate Bobby Moore.   (Docket Entry No. 60 at 105).   Through litigation which resulted in two trips to the Supreme Court, Bobby Moore's case caused the Texas state courts to bring their *Atkins* jurisprudence in line with the DSM-V and federal law.   *See Ex parte Moore*, 548 S.W.3d 552, 555 (Tex. Crim. App. 2018) (resulting in *Moore I*); *Ex parte Moore*, 470 S.W.3d 481, 484 (Tex. Crim. App. 2015) (resulting in *Moore II*).

But Mr. McCann did not have Johnson evaluated under the new DSM-V standards or raise an *Atkins* claim on Johnson's behalf until 2019.   In the evidentiary hearing Mr. McCann testified

that he did not raise an *Atkin* claim after the DSM-V issued because of "a whole bunch of decisions that come together." (Docket Entry No. 60 at 114). Mr. McCann provided two main reasons for withholding an *Atkins* claim. Mr. McCann explained that "the primary thing" was that he focused on litigating a different claim for which he had received a Certificate of Appealability rather than investigating whether Johnson was eligible for a diagnosis of intellectual deficiency. (Docket Entry No. 60 at 134). Mr. McCann, however, repeatedly emphasized that his decision also came about because capital litigators "were still struggling with the *Briseno* standard." (Docket Entry No. 60 at 114). Mr. McCann feared that raising an *Atkins* claim in state court—as AEDPA's exhaustion doctrine required him to do in the first instance—would result in a decision by the state courts which would eventually result in unfavorable federal review. Mr. McCann testified that he felt impaired in this case by what he saw as inalterable Texas law. Respondent argues that Mr. McCann engaged in strategic decision making to which courts must defer. The Court must decide if these decisions may forgive strict compliance with AEDPA's limitations period.

Several features of Mr. McCann's decision-making cause concern in this case. **First**, Mr. McCann formulated a strategy which, while ostensibly based on anxiety about the deference afforded claims, operated to withhold them from federal court. Federal courts have long worried that inmates may engage in "sandbagging" by holding back claims until a more-favorable forum becomes available. *Murray v. Carrier*, 477 U.S. 478, 492 (1986). Federal habeas procedure has strongly criticized "a strategy of piecemeal attacks on [an inmate's] conviction." *Galtieri v. Wainwright*, 582 F.2d 348, 358 (5th Cir. 1978). Capital attorneys absolutely should not withhold viable claims when an avenue of federal relief exists. *See In re Sparks*, 944 F.3d 572, 574 (5th Cir. 2019) (Jones, J., specially concurring) ("It is hard to envision competent counsel's having sat on a potentially meritorious exclusion from capital punishment until the eve of execution.").

Federal review cannot countenance any decision—however strategic it may seem—formed with the intent of withholding potentially viable claims from an initial federal habeas petition.

**Second**, Mr. McCann believed that exhausting an *Atkins* claim in state court would be futile at best, and possibly fatal to any hope of federal relief. Yet the Supreme Court has been wary of forgiving an inmate's trepidation at exhaustion when state law was unfavorable to him. *See Engle v. Isaac*, 456 U.S. 107, 130 (1982) ("If a defendant perceives a constitutional claim and believes it may find favor in the federal courts, he may not bypass the state courts simply because he thinks they will be unsympathetic to the claim. Even a state court that has previously rejected a constitutional argument may decide, upon reflection, that the contention is valid."). The Supreme Court has found that unfavorable state law does not forgive exhaustion even when the disputed claim "was unacceptable to that particular court at that particular time." *Id.* at n. 35 (citations and quotation marks omitted).

**Third**, concerns about AEDPA's exhaustion and deferential provisions came at a cost: running afoul of the stringent one-year limitations period. Mr. McCann said that he was waiting for the Court of Criminal Appeals to change its state-law interpretation of *Atkins* which would then trigger "a new factual basis or a new legal basis and essentially you'd have one year from the time of either." (Docket Entry No. 60 at 140). Yet the Fifth Circuit has not treated Texas' eventual compliance with the DSM-V as a new trigger date for the limitations period. *Milam*, 838 F. App'x at 798; *Sparks*, 939 F.3d at 632. It is unclear how any change in a state court's application of settled federal law would create a basis for successive proceedings under section 2244.

**Fourth**, Mr. McCann feared that a trip through the state courts would result in a decision which, when later considered by the federal courts under the AEDPA's deferential review, would doom any federal *Atkins* claim. Mr. McCann based this fear on Texas' use of the *Briseno* factors—

or ones similar to them after *Moore I*. Even though the Fifth Circuit had formerly "held that *Briseno* is a constitutionally permissible interpretation and application of *Atkin*," *Matamoros v. Stephens*, 783 F.3d 212, 218 (5th Cir. 2015), that changed when the Supreme Court expressly rejected the *Briseno* factors in 2017.[15] After *Moore I*, the federal courts gave no deference to the *Briseno* factors. *See In re Cathey*, 857 F.3d 221, 235 (5th Cir. 2017).

Accordingly, Mr. McCann's strategy does not hold water after *Moore I*. Mr. McCann expressed confidence that the Court of Criminal Appeals would replace *Briseno* with another standard based on lay biases rather than expert diagnostic standards. (Docket Entry No. 60 at 84). But that would not matter in federal court. Whether or not Texas courts applied *Briseno* or another other judge-made standard, federal law (now based on the DSM-V) would guide federal review.[16] The Court cannot endorse decisions based on the fear of a standard that the federal courts would never honor.

**Fifth**, Mr. McCann based his decision on his own subjective beliefs about the viability of an *Atkins* claim without seeking an expert assessment of that claim's strength. Since the beginning of his representation, Mr. McCann believed that Johnson was intellectually disabled. (Docket Entry No. 60 at 138). Mr. McCann knew about changes in the DSM-V but did not immediately seek an expert evaluation of Johnson for intellectual disability.

---

[15]    It is worth noting that the *Moore* case never reached the federal habeas stage. The Supreme Court took the case up from the Texas state courts. Even if AEDPA theoretically posed a threat to federal habeas review, the Supreme Court erased Texas' *Briseno* jurisprudence on review from the state habeas courts.

[16]    Johnson argues that, while the Court of Criminal Appeals again denied relief to that one inmate after *Moore I*, the Court of Criminal Appeals recognized that *Briseno* was no longer the law and repeatedly expressed a willingness to apply the correct law. Johnson provides an extensive summary of cases in which the Court of Criminal Appeals appears to have followed the dictates of *Moore I*. (Docket Entry No. 63 at 5-7). While Johnson's briefing on this point may prove that Mr. McCann was incorrect in his assessment of how Texas cases would proceed, it still somewhat misses the mark. Once the Supreme Court decided *Moore I*, it was the law of the land. A federal court's review at that point was not on the sufficiency of any state-judge-made standard—it was whether an inmate could show that the state-court decision was contrary to, or an unreasonable application of, federal law. 28 U.S.C. § 2254(d)(1). Federal courts would not defer to decisions departing from federal law.

Time has shown that the DSM-V transformed a weak *Atkins* claim into a viable ground for relief. Mr. McCann testified that the DSM-V did not have any effect on a Texas inmate's ability to raise an *Atkins* claim because *Briseno* was still good law. (Docket Entry No. 60 at 138). Mr. McCann explained that the publication of the DSM-V was "pretty much no help" because the *Briseno* standards were still in place. (Docket Entry No. 60 at 139). Mr. McCann particularly worried that the "aggravating factors" in Johnson's case would doom him under the *Briseno* paradigm. (Docket Entry No. 60 at 73). Mr. McCann explained: "So as far as bad facts, he had some pretty bad facts to overcome and under the *Briseno* standard, he would not have made [an intellectual disability] claim." (Docket Entry No. 60 at 73). Mr. McCann was specifically concerned because Johnson "was more or less in charge, which shows leadership," he "hid the vehicle," he "was the shooter," and was involved in "an extraneous killing." (Docket Entry No. 60 at 139).

The seven *Briseno* factors did not necessarily look at aggravating facts or contain factors explicitly covered by Mr. McCann's concerns. *Briseno* attempted to lay aside "any heinousness or gruesomeness" of the crime. *Williams v. State*, 270 S.W.3d 112, 114 (Tex. Crim. App. 2008). Mr. McCann possibly referred to *Briseno*'s focus on whether an offender's conduct "show[ed] leadership," exhibited an ability to "formulate[] plans," or "require[d] forethought, planning, and complex execution of purpose." *Id.*

Still, *Briseno* was never meant to replace professional standards, but to be weighed with (or against) them. The Court of Criminal Appeals did not craft the *Briseno* standards as "a substitute or alternative definition of [intellectual disability]," but only as additional factors which a court "'might also' take into consideration." *Chester v. Thaler*, 666 F.3d 340, 355 n.5 (5th Cir. 2011) (Dennis, J., dissenting); *see also Briseno*, 135 S.W.3d at 8. The Court of Criminal Appeals

"did not make consideration of any or all of [the *Briseno* factors] mandatory," but rather expressed that "they reflected [its] concern that the [professional] guideline should not be considered in isolation, but rather in the context of the concerns expressed by the Supreme Court in *Atkins*." *Ex parte Sosa*, 364 S.W.3d 889, 892 (Tex. Crim. App. 2012).  An attorney could not make a fair assessment of how the *Briseno* factors would weigh in that calculus without knowing how the professional factors would weigh in also.  Concerns about *Briseno* were only one piece of an underdeveloped picture of how Texas courts would view Johnson's intellectual functioning.

Mr. McCann testified that he knew raising an *Atkins* claim on Johnson's behalf would require more investigation.  (Docket Entry No. 60 at 66-67).  Mr. McCann still relied on his own subjective assessment of Johnson's intellectual functioning and how it would factor into a legal analysis. Despite his familiarity with *Atkins* law, Mr. McCann lacks the education and training to diagnose intellectual disability.   Testing finally performed in 2019 reveals a much stronger *Atkins* claim than anticipated by the trial evidence.  There is no reason to believe that testing performed at any point after the DSM-V issued would have resulted in a similarly strong *Atkins* claim.

Accordingly, Mr. McCann formulated strategy while only knowing half of the equation.  Any valid strategy involving Johnson's intellectual functioning must rest on scientific inquiry and a full understanding of the evidentiary landscape, not conjecture.

**Finally**, Mr. McCann aggressively challenged the *Briseno* standard for one of his clients—Bobby Moore.  Mr. McCann participated in litigation which, through two trips to the Supreme Court and repeated efforts in the Court of Criminal Appeals, finally expunged Texas law of its reliance on improper factors in *Atkins* cases.  Mr. McCann deserves commendation for his efforts in the *Moore* case which served to realign Texas' precedent with federal law.

Notwithstanding his advocacy on behalf of Bobby Moore, the difference in how Mr. McCann handled the two cases is extraordinary. Mr. McCann did not file an *Atkins* claim on Johnson's behalf out of fear that the Court of Criminal Appeals would not relinquish the *Briseno* standards. (Docket Entry No. 60 at 115-16). In Johnson's case, Mr. McCann decided that AEDPA deference created "a rigged game for [his] client," so he "thought the better option would be to see if we could find some way under a new standard or to get a new standard." (Docket Entry No. 60 at 142). Mr. McCann testified: "to me, if I couldn't get a fair standard of review, then none of this was going to help because I'd be litigating it in a state court where I was likely to get an adverse finding." (Docket Entry No. 60 at 124).

But Mr. McCann did nothing in this case but wait for a new standard to emerge. While he aggressively fought against the *Briseno* standard in *Moore*, Mr. McCann felt hobbled by the *Briseno* standard in Johnson's case. Zealously litigating an *Atkins* claim on Johnson's behalf (especially after *Moore I*) could have ended in the same result as in *Moore*. Without rendering an opinion on the strength of the *Atkins* claim in either case, the Court observes that both Moore and Johnson have similar cases for *Atkins* relief. Moore relied on an IQ "score of 74, adjusted for the standard error of measurement, [which] yields a range of 69 to 79." *Moore I*, 137 S. Ct. at 1049. Johnson alleges his "IQ score was a 70, squarely in the range of intellectual disability." (Docket Entry No. 1 at 14). Moore relied on "affidavits and . . . testimony from Moore's family members, former counsel, and a number of court-appointed mental-health experts. The evidence revealed that Moore had significant mental and social difficulties beginning at an early age." *Moore I*, 137 S. Ct. at 1045. Johnson relies on similar material, culminating in an expert's opinion that he "functions adaptively in the range of Intellectual Disability." (Docket Entry No. 1 at 28). On their face, the case for *Atkins* relief seems similar for both Johnson and Moore. A comparison between

the two cases begs the question of it could have been Johnson's case, not Moore's, in which the Supreme Court ended Texas' use of the *Briseno* standard.

Mr. McCann knew that the DSM-V had probably created a viable claim for Johnson. He successfully litigated *Atkins* claims in state court based on the DSM-V for other inmates. But he did not raise a claim on Johnson's behalf in federal or state court. Mr. McCann's representation was an impediment to filing which, until removed, precluded Johnson from advancing an *Atkins* claim. Mr. McCann's "choice not to litigate a meritorious claim on behalf of his death sentence client . . . had the functional effect of forfeiting any federal review of Mr. Johnson's *Atkins* claim." (Docket Entry No. 63 at 2). Mr. McCann's representation amounts to an extraordinary circumstance that warrants equitable tolling in this case.

**E.    Diligence**

To merit equitable tolling, Johnson must also have shown diligence. The Supreme Court has instructed that "[t]he diligence required for equitable tolling purposes is reasonable diligence, not maximum feasible diligence." *Holland*, 560 U.S. at 653 (quotation omitted). Mr. McCann represented Johnson throughout the whole period when he should have filed his *Atkins* claim. Despite that representation, "petitioners seeking to establish due diligence must exercise diligence even when they receive inadequate legal representation." *Manning v. Epps*, 688 F.3d 177, 185 (5th Cir. 2012). "The act of retaining an attorney does not absolve the petitioner of his responsibility for overseeing the attorney's conduct or the preparation of the petition." *Doe v. Menefee*, 391 F.3d 147, 175 (2d Cir. 2004) (Sotomayor, J.).

Johnson has made a prima facie showing that he is intellectually disabled.  Respondent contends that Johnson, apparently despite his low IQ and possible intellectual deficiency, should have recognized that a potential *Atkins* claim existed, discerned the probable impact of AEDPA's limitations period, and encouraged Mr. McCann to litigate more zealously.  (Docket Entry No. 64 at 52-54).  Respondent cites no law which places that burden on a potentially intellectually disabled client.  With his level of functioning as described in the exhibits to his federal petition, it is unreasonable to expect that Johnson could litigate an *Atkins* claim on his own, much less one based on the distinctions brought by changes in the law and the DSM-V.

Johnson's attorneys sought leave to file a successive federal petition soon after their appointment.  Under the fact-dependent circumstances of this case, the Court finds that Johnson has shown the requisite diligence to merit equitable tolling.

### F.      Conclusion of Equitable Tolling

Attorneys representing capital defendants face a challenging task, particularly once they reach federal habeas corpus review.   At that point, the presumption of innocence has long dissipated.  Capital inmates come to federal court after unsuccessful attempts at state court review which will haunt them throughout AEDPA's federal habeas process.  With limited exceptions, federal courts will heavily defer to the state court's earlier rejection of their claims.  Federal review largely eschews any new factual development.  Overarching principles of comity, federalism, and finality of judgments tip the scales away from the inmate's favor.  The task of capital habeas practitioners is formidable.

Capital habeas practitioners—like all attorneys—must make tactical decisions which will place their client's interests before the courts in the most favorable light.   Complex and interweaving procedural doctrines—such as the federal exhaustion doctrine and AEDPA's

deferential review scheme—force attorneys to plan the most effective manner in which to present viable claims.  The fact that federal claims must first pass through state court—and do so in a manner which alters the prism through which federal courts consider claims—may influence how an attorney chooses to present his claims.

Capital defense attorneys know that later stages of review may place their decisions under a microscope.  Courts try to judge an attorney's decisions without the harsh, but illuminating, light of hindsight.  Still, decisions made in the moment may not hold up over time.  When weighing the various factors which play into litigation strategy, an attorney bears an overarching ethical duty to leave no potentially meritorious claim aside, to preserve a client's right to raise any claim which may provide relief.  In capital litigation, those litigation decisions may be ones of life or death.

As it stood under the then-governing psychological standards, Johnson did not have a viable *Atkins* argument at trial.  That changed when the DSM-V manual changed the diagnostic framework for intellectual disability on May 18, 2013.  This development happened at a disadvantageous time for Johnson—he had already finished state post-conviction review and his federal habeas proceedings neared completion.  Mr. McCann made decisions that would nearly close the door to federal review.  Those were difficult decisions, decisions which have come to cloud other zealous efforts Mr. McCann has made on behalf of Johnson.  Mr. McCann has acted on Johnson's behalf in a way that has required the courts to examine many important issues.  The weight of those good decisions, however, cannot sink the potentially meritorious claim Johnson advances in his successive petition.  In fact, the contrast between Mr. McCann's admirable representation in *Moore* which forced Texas into compliance with Supreme Court standards stands in contrast to his inaction in this case.  Courts cannot countenance any litigation strategy based on withholding grounds for relief.

A zealous attorney should have brought Johnson's *Atkins* claim to the federal courts many years ago. Johnson's claim deserves to be heard. The Court finds that Johnson has shown that equitable tolling should forgive his failure to comply with the technical temporal requirements of AEDPA.

## V.    CONCLUSION

For the reasons discussed above, the Court finds that Johnson has complied with AEDPA's requirements for the consideration of his federal habeas corpus petition. The Court **DENIES** Respondent's Renewed Motion to Dismiss. (Docket Entry No. 64).

The Court **ORDERS** the parties to submit a joint proposed scheduling order for the continued litigation of his case within **twenty-one (21) days** from the entry of this Order.

SIGNED on _____OCT 2 8 2022_____ at Houston, Texas.

_____

ALFRED H. BENNETT
UNITED STATES DISTRICT JUDGE